202 So.2d 477 (1967)
ALADDIN OIL COMPANY, Inc., et al.
v.
RAYBURN WELL SERVICE, INC., et al.
No. 2269.
Court of Appeal of Louisiana, Fourth Circuit.
July 17, 1967.
Rehearing Denied October 4, 1967.
*478 Ernest Carrere, Jr., New Orleans, for Aladdin Oil Co., Inc., plaintiff-appellee-appellant.
John F. Fox, Jr., New Orleans, and John J. Maxwell, Metairie, for Rayburn Well Service, Inc., and others.
P. A. Bienvenu, and Robert N. Ryan, Bienvenu & Culver, New Orleans, for Employers Mutual Liability Insurance Co., third party defendant-appellant.
Before REGAN, YARRUT, and CHASEZ, JJ.
CHASEZ, Judge.
This case arises out of an oil well casualty which occurred on or about June 26, 1961. The well, known as Waterford No. 1, was located in Bayou Couba Field in St. Charles Parish, Louisiana. The plaintiffs are Aladdin Oil Company, Inc., the operator of the well, Aladdin Exploration Company, Inc., Hershey Oil Corporation and United States Fidelity and Guaranty Company as subrogee for the damages it had reimbursed the plaintiffs. Named defendants were the Rayburn Well Service, Inc., Johnnie S. Rayburn, Lawrence D. Rayburn, Donald Rayburn and Harold Barrios.
At the time of the casualty the defendants, Rayburn Well Service, Inc., its employees and Johnnie S. Rayburn and Donald Rayburn were engaged in re-work activities upon the well. The plaintiffs alleged that Hershey Oil Corporation and Aladdin Oil Company, Inc. were granted a "farm-out" by written agreement of May 2, 1960, covering a mineral lease dated June 10, 1959 between Waterford Oil Co. lessor and *479 the California Co., lessee. On May 9, 1960, Aladdin Oil Company, Inc. assigned all rights, title and interest in the farmout agreement to Aladdin Exploration Company, Inc. On that same date Aladdin Oil Company, Inc., as operator, and Hershey Oil Corporation and Aladdin Exploration Company, Inc., as non-operators, entered into an operating agreement covering drilling operations on the farmout.
It was alleged that in 1961 Aladdin Oil Company, Inc. negotiated with Johnnie S. Rayburn and Rayburn Well Service, Inc. to rework an oil well in St. Charles Parish for the account of the parties to the operating agreement, and that this contract was intended to be reduced to writing, but was acted on by the defendants before the contract was actually signed. The plaintiffs alleged that Johnnie S. Rayburn and Donald Rayburn and other representatives of the defendants had complete and exclusive control of the re-work operations. The plaintiffs pleaded "res ipsa loquitur" and, alternatively, alleged various acts of negligence; and alleged that all of the named defendants participated jointly in all acts of commission or omission with Rayburn Well Service, Inc.
In their answer, the defendants filed what amounted to a general denial, and by third-party petition sued Employers Mutual Liability Insurance Company, its agent, Herbert Rodrigue, Surplus Insurance Underwriters of Dallas, Texas and certain underwriters at Lloyd's London under a policy issued by Employers Mutual Liability Insurance Company which allegedly provided "a legal defense and protection" which defense was refused to defendants, and under a policy issued by Surplus Insurance Underwriters by which they and the London underwriters covered the liabilities alleged by the original plaintiffs. It was also alleged by this and a supplemental third-party petition that Employers Mutual Liability Insurance Company and Herbert Rodrigue, if not liable in contract, were liable in tort for not actually providing coverage as represented by them.
The defendants of the original petition also reconvened against the original plaintiffs (except United States Fidelity and Guaranty Company) alleging that Aladdin Oil Company, Inc. verbally accepted an offer to re-work certain wells after receiving such from Johnnie S. Rayburn together with an inventory schedule of Barge Rig No. 5 to be used in the re-work job. It was alleged that the re-work of Waterford No. 1 Well began under the supervision of the Chief Petroleum Engineer of Aladdin Oil Company, Inc. who supplied, as customary, the mud program necessary to prevent the well from kicking and blowing out; that while taking the "Christmas tree" down Rayburn Well Service Inc's employee noticed that the short string back pressure valve was defective and this was called to the attention of the defendants in reconvention (the Aladdin group), but they said the manual valve on the short string of tubing could be used. It was also alleged that damage of $100,000 to equipment and its use were sustained due to the negligence of the Aladdin Oil Company, Inc., defendants in reconvention, in failing to provide a proper mud program, back pressure valves, and a competent supervisory engineer, and in insisting that operations proceed without delay and that a manually operated safety valve be placed on top of the short string of tubing.
Employers Mutual Liability Insurance Company and Herbert Rodrigue denied liability and asserted that it was not the intent of the parties that claims as alleged in the original petition be covered. Various exclusionary clauses of the policy were also plead whereby it was alleged that there was no liability for loss due to underground damage, damage to property over which the insured had control or owned or occupied or rented, and damage to property on or about the surface of the earth caused by blowout or cratering.
A supplemental petition of the third-party plaintiffs asked for attorney's fees from Employers Mutual Insurance Company for failure to defend them, which *480 claim was rejected by the insurance company.
The original plaintiffs, of course, denied the claims of the plaintiffs in reconvention.
An answer by Jack Creswell, representative of certain underwriters at Lloyd's London, was filed, which answer amounted to a general denial. A stipulation was filed whereby any judgment affecting Jack N. Creswell was to have the same effect upon the subscribing underwriters at Lloyd's London.
Surplus Insurance Underwriters of Dallas, Texas excepted to the jurisdiction of the lower Court over it on July 30, 1962. At a hearing in which other exceptions not pertinent here were disposed of, the Court stated that this exception to jurisdiction was considered abandoned. Subsequently, an identical exception was filed on April 1, 1963.
Employers Mutual Liability Insurance Company and Herbert Rodrigue also filed exceptions of no right of action and no cause of action.
On October 19, 1964 the trial Court rendered judgment with reasons. The Court found that the real parties at interest among the plaintiffs were Aladdin Exploration Company, Inc., Hershey Oil Corporation, and United States Fidelity and Guaranty Company, and that Aladdin Co. Inc. was merely the operator of the well, and its demand was dismissed. It was further found that no right or cause of action was made out against Harold Barrios and Lawrence D. Rayburn and the claims against them were dismissed.
The Court found Rayburn Well Service, Inc. and its officers and employees to be negligent and liable for the damages incurred to the plaintiffs. As to quantum, the Court found that well and fire control costs were proved to the extent of $16,372.58, and repairs to the surface equipment damaged by fire to the extent of $20,912.32. The additional cost of reworking the well caused by the fire was found to be $28,141.49. The trial Court also felt that the plaintiffs' claim for oil or damage to the underground oil sand should be denied as being too speculative.
The reconventional demand against the original plaintiffs was considered as not having been proved, and it was likewise stated that there was no right or cause of action made out against third-party defendants, Herbert Rodrigue, Surplus Insurance Underwriters of Dallas, Texas and certain underwriters of Lloyd's London. However, Employers Mutual Liability Insurance Company of Wisconsin was found to be liable unto third-party plaintiffs under its policy.
The Court in its judgment held as follows:
"Accordingly, there is judgment herein in favor of plaintiffs Aladdin Exploration Co. Inc., and Hershey Oil Corp. in the amount of $44,514.07 and in favor of plaintiff United States Fidelity & Guaranty Co. in the amount of $20,912.32, all against defendants Rayburn Well Service, Inc., Johnnie S. Rayburn and Donald Rayburn in solido, together with legal interest thereon from date of judicial demand until paid.
"Further, the demands of plaintiff Aladdin Oil Co., are dismissed and all demands of plaintiffs against defendants Harold Barrios and Lawrence D. Rayburn are dismissed.
"Further, the reconventional demands of Rayburn Well Service, Inc., Lawrence D. Rayburn and Harold Barrios against Aladdin Oil Co., Aladdin Exploration Co. and Hersey (sic) Oil Corp. are dismissed.
"Further, there is judgment herein in favor of third-party plaintiffs Rayburn Well Service, Inc., Johnnie S. Rayburn and Donald Rayburn and against third-party defendant Employers Mutual Insurance Co. of Wisconsin in the amount of $65,426.39, together with legal interest thereon from date of judicial demand until paid.

*481 "Further, that all demands against third-party defendants Herbert Rodrigue, Surplus Insurance Underwriters of Dallas, Texas and Certain Underwriters at Lloyd's, London, are dismissed.
"Further, that the demand of third-party plaintiffs for attorney fees from third-party defendant Employers Mutual Insurance Co. of Wisconsin is denied.
"All costs to be shared equally among defendants Rayburn Well Service, Inc., Johnnie S. Rayburn, Donald Rayburn and third-party defendant Employers Mutual Insurance Co. of Wisconsin."
From this judgment there are several appeals. Rayburn Well Service, Inc. and Johnny S. Rayburn and Donald Rayburn appealed from the judgment against them and in favor of the plaintiffs, Aladdin Exploration Company, Inc., Hershey Oil Corporation and United States Fidelity and Guaranty Company on the ground that the Court erred in finding the defendants negligent in the re-work operation; and also appealed from the judgment dismissing their demand for reasonable attorney's fees from Employers Mutual Liability Insurance Company.
The original plaintiffs appealed from that portion of the judgment denying their claim for loss of minerals under the ground as not sufficiently proven, and also for a disallowance by the trial Court of an item of $918.30 for additional engineering time involved in the re-work operation of the well, and an item of $1,210.23 for rental expenses of third-party service and equipment for extra time.
The third-party defendant, Employers Mutual Liability Insurance Company appeal from the judgment in favor of the third-party plaintiffs, Rayburn Well Service, Inc., Johnnie S. Rayburn and Donald Rayburn and against it on the grounds that the previously mentioned exclusionary clauses were applicable to the casualty.

THE FACTS
We will attempt to summarize the facts as briefly as possible, the record in this case containing over 3000 pages.
The Waterford No. 1 Well had been drilled in 1960 and was a dual completion well, that is, oil was produced from two different depths by means of the separate lengths of tubing, a long string and a short string. Eventually salt water was being produced through the long string of tubing, and more gas than normal in the short string, and the decision was made to rework the well in order to remedy the situation. Paul Noll, a Vice-President of Aladdin Oil Company, Inc., and Johnnie (Johnny) S. Rayburn President of Rayburn Well Service, Inc., agreed that the latter company would perform the re-work job. On June 25, 1961 Mr. Noll and Mr. Rayburn met at a site where the workover barge was taking on mud. Here they talked of the necessary third-party services arrangements and the general program for the job. Mr. Noll prescribed 10.3 1bs/gal as the proper weight of the mud to be used in "killing" the well. Noll left the mud-loading site and returned to New Orleans.
The Rayburn barge then proceeded to Waterford No. 1 Well and the Rayburn rig was spotted over the "Christmas tree" of the well. The registered pressure at the Christmas tree immediately prior to the commencement of the re-work operation was 2800 to 3000 psi (pounds per square inch).
At 4:00 P.M. on June 25, 1961, B & J Well Service, a third-party service furnished by the Aladdin Oil Company, Inc., arrived and pumped 70 barrels of the conditioned mud into the two-inch tubings of the well, thus killing the well by overcoming the well pressure. It had been calculated at the request of the trial Court that 32 barrels of mud would fill a two-inch casing to a depth of 9000 feet and 10.3 lbs/gal mud would exert 4757.94 psi at 8940 feet, the approximate depth of the short string of tubing.
*482 On June 26, 1961 at 4:00 A.M. Mr. Forrester of GULFCO, another third-party furnished by Aladdin Oil Company, Inc., arrived. He found no pressure at the well head and was satisfied that the well was dead. With the assistance of the Rayburn crew he installed back-pressure valves. He removed the "Christmas tree", installed blowout preventers, and raised the short string of tubing six to eight feet and checked his valves to find no pressure. He then removed his safety valve and the Rayburn crew rigged up, at which time the well was vented to the atmosphere, there being no pressure present.
To the open short string of tubing, Rayburn Well Service, Inc. attached a thirty-foot length of pipe with a high pressure safety valve, the Nordstrom safety valve, which was supplied by Aladdin Oil Company, Inc., atop the length of pipe. To this valve was attached a rotary hose which was connected to the standpipe on the rig. This standpipe connected to the mud pump with three valves in the pump manifold.
With this equipment hooked up, Rayburn Well Service, Inc. began to pick up the short string and experienced a "dragging", but continued to pull the short string from the bottom hole packer and circulated mud through the short string, while working the short string.
Between 6:15 and 6:30 P.M. a kick on the casing, the large pipe containing the strings of tubing, was experienced causing Rayburn Well Service, Inc. to shut down the mud pump. The pump was restarted, and another kick caused the pumps to be stopped again. The Nordstrom valve was closed and the blow-out preventers checked. The Nordstrom valve was reopened and a pressure of 650 psi on the short string was found. Shortly thereafter the pressure had risen to 1250 psi.
It was decided that a gas pocket was present which could be bled off. A bleeder line was attached to the standpipe, and a low pressure valve attached to the bleeder line. At this time the mud pump was stopped and all valves were open. Johnnie (Johnny) S. Rayburn testified that it was approximately for one hour up to the casualty that the Nordstrom valve was open.
When the bleeder line was opened it flowed about 1½ barrels of liquid, then gas. The gas froze the low pressure valve and the Court found that the gas was "evidently forced back into the pump and fire started."
It was realized that this was not a mere gas pocket, but real well pressure. An attempt was made to close the high-pressure Nordstrom valve, but before this could be done it was necessary for all personnel to leave the rig because of the fire which had started. The end result was that the fire continued until extinguished at 7:00 A.M. on June 27, 1961. The well was vented to the atmosphere and "blowing" until the Nordstrom valve was closed at 11:00 A.M. on June 27, 1961.
We first address ourselves to the most basic issue of this case, namely, was the re-work operation performed by the defendants in the main demand, i. e. the Rayburns and their crew, in a negligent manner? After examining the testimony and evidence in this regard we can come to no other result than an affirmance of the trial Court's decision finding negligence. The defendants-appellants state in their appellate brief that they do not dispute the fact findings of the lower Court, but argue that even under those facts and findings no negligence was established. The key factor in the Court's decision appears to be that the "only valve capable of closing the well" was left open and unmanned and unguarded. The reference is to the high-pressure Nordstrom safety valve. In effect, the defendants-appellants (hereinafter simply referred to as "Rayburn") argue that the conclusion is one aided by hindsight in the light of the events that occurred, which events the plaintiffs had no knowledge of, and which could not have *483 been known until the attempt to bleed the pressure off.
The defendants contend that the expert testimony in this case reveals that it was not unusual in the industry to encounter evidence of pressure when reworking a well similar to that encountered on this occasion, and that one of the accepted and approved means to eliminate the pressure is by bleeding it off. However, it is apparent that the real issue here is whether or not the procedure used in bleeding the pressure was proper and without negligence on the part of Rayburn. The answer is that there was negligence because the proper safeguards were not present when the bleeding process began, as all valves were open and the Nordstrom valve was left open, unguarded and unmanned. The cases cited by Rayburn to the effect that only anticipated dangers must be guarded against to preclude a finding of negligence are inapplicable because the possibility of real well pressure, rather than a gas pocket, is a danger which should have been anticipated and guarded against while venting the well to the atmosphere for the purpose of bleeding pressure, at least to the extent of manning the Nordstrom valve.
We note that Mr. Charles V. Cusimano, petroleum engineer, quoted by counsel for Rayburn, stated that he would bleed off the pressure under similar circumstances "But I would have taken precautions before doing so."
The plaintiffs' evidence went further to establish negligence. Called to the witness stand on their behalf was Mr. John C. O'Connor, a petroleum engineer, qualified as an expert in his field, concerning production of oil and gas in Louisiana. This witness testified that in the face of the rise in pressure, from 650 psi to over 1200 psi in the time span given in the record anywhere from 25 minutes to approximately 65 minutesthere was evidence of a communication with a source of pressure and that the pressure should not have been attempted to be bled off.
We quote the following excerpt from his testimony:
"Secondly, I would not attempt to bleed off pressure at any time with just the sole use of valves. I would want some positive control set up through the use of chokes. Thirdly, I would not want to try to bleed off pressure and use the rotary hose as a means of conveying that pressure to the atmosphere. If I was going to bleed off pressure I would want steel hoses and have a positive connection to the top of the tubing string and have all steel to the chokes and valves and then to the atmosphere.
Q. If you were on a job with the driller or tool pusher and you had a pressure such as I have indicated to you to be between 600 and 650 pounds, which in a period of time between 25 minutes and an hour and five minutes, increased in the tubing to 1200 to 1400 pounds and you did not have the devices which you have mentioned, I think you said steel hose and chokes and other equipment, what would you do?
A. Well, I would close the well in and I would call for the equipment.
Q. With the setup that as pictured on the drawings Aladdin B and C, how would you close the well in?
A. I would close the valve B that is shown here at the top of that 30 foot joint of tubing, that is colored red and it's immediately below the rotary hose."
The valve referred to was the Nordstrom safety valve.
This evidence convinced the lower Court, and this Court likewise, that the well should have been shut in sooner, when the well pressure was steadily rising to over 1200 psi and the failure to do this, even to the extent of leaving the high-pressure Nordstrom safety valve open and unattended, was negligence on the part of Rayburn.
*484 We adopt the following findings of the lower Court relative to negligence:
"Nevertheless, Rayburn, Inc., in the face of mounting well pressure, stopped the mud pump, left the high-pressure valve open, and elected to install a bleeder line with a low-pressure valve onto a standpipe and pump that had low-pressure valves, all connected to the high-pressure valve with a rotary hose that could, and did, burn. In short, with every reason to believe that the well should be shut in, Rayburn, Inc. left the only valve capable of closing the well, unguarded, unmanned and open. This is not that degree of care that a prudent rework operator would exercise. This was negligence and this negligence was the proximate cause of the fire.
"This Court concedes that Rayburn, Inc. was confronted with an emergency when the low-pressure valve froze and the pump caught fire. But this Court must hold that under the circumstances and conditions existing immediately prior to this emergency that Rayburn, Inc., as a reasonable, prudent re-work operator, did know, or should have known, that such an emergency could, or would occur, and that Rayburn, Inc., as a reasonable prudent re-work operator, should have had the high-pressure valve either manned or closed to prevent such an incident as did happen.
"This Court cannot find Aladdin to have exercised any control or responsibility over the re-work operation so as to have the negligence of Rayburn, Inc. charged to or imputed to Aladdin under the Doctrine of Respondeat Superior or any of the other relationships well known to our law as creating and establishing such imputation.
"Nor can this Court find that Aladdin failed in the supply of third-party services required of it, nor did Aladdin neglect to disclose any pertinent data relative to Waterford No. 1."
There is no serious attempt to show that the Aladdin Oil Company, Inc. was in any way responsible or negligent in any connection with the re-work operation and the last two paragraphs quoted above of the Court's findings is amply supported by the record.
Having determined Rayburn to be liable, we must now consider the extent to which they may be cast in damages. The lower Court granted an award to the Aladdin group and United States Fidelity and Guaranty Company, hereinabove stated, in the total sum of $65,426.49. It disallowed items attributed to extra engineering time of Mr. Noll and rentals paid for third-party equipment and services for extra time. Also denied to the Aladdin group was their substantial claim for $48,418.56 representing loss of oil and gas from the underground reservoir. The Court stated:
"Plaintiffs claim for loss of oil or damage to the underground oil sand must be denied. This Court will concede that the long and well established doctrine that fugitive sub-surface minerals in place are not subject to ownership may well not apply here since the owner and lessee of the land had tapped into this fugitive sand by pipe and by means of natural pressure or pump had control over the minerals therein to such a degree as to amount to possession. This Court will further concede that Gliptis v. Fifteen Oil Co., [204 La. 896] 16 So.2d 471 establishes that trespass may be had in the subsurface and that Adams v. Grigsby, 152 So.2d 619, establishes that an intentional or negligent trespass may result in liability for damage.
But this Court cannot concede that plaintiffs have established more than a highly speculative claim to damages because:
"1. After the fire and the re-work operation the well produced some 31,200 barrels of oil. With due respect *485 to the excellence of plaintiff's expert in delineating the size of the reservoir and estimating its capacity this is far from the exact computation or measure of property value deemed necessary by our Courts upon which to award damages.
"2. It was not established with that certainty required by law that the negligent act of Rayburn in allowing the well to burn actually caused damage to the reservoir. In fact the venting of gas might have, in itself, reduced the high gas/oil ratio that caused plaintiffs to re-work the well.
"3. The delineation of the oil reservoir and the estimate of its capacity was well done and complete insofar as data was available to the experts. But this data was not complete enough and resulted in conjectures by the expert that are not grounded in fact nor information:
"By study of electric logs and core tests the expert could, as fact, state the depth of the oil sand immediately around the tubing. But electric logs and core tests of the wells, Gulf 67, Gulf 68, Calco 1, Calco 2, Calco 3, Aladdin 1, Aladdin 2 and Aladdin 3 represented findings of oil sand at locations separated by many thousand feet and to extend either the depth of the sand or its delineation or confines in any direction from the tubing of the well must be speculation or conjecture. Certainly not an exact science upon which damage may be based."
After considerable deliberation, we conclude that these findings of the trial Court are correct.
The only complaint against the quantum findings of the Court is made by the original plaintiffs, the Aladdin group. Assuming the posture of appellants on this question, they maintain that the Court erred in refusing an award for the two relatively minor items of damage for engineering costs and rental referred to heretofore and for the loss to the underground sand.
Counsel for the plaintiffs have striven mightily to show that the estimate of the value of the underground minerals given by their expert witness, Mr. George Dausch, Jr. was sufficiently accurate evidence upon which to base an award. Mr. Dausch was qualified as an expert petroleum engineer. The plaintiffs point out that upon the type of evaluation made by Mr. Dausch money would be loaned by lending institutions, and the plaintiffs elicited testimony to show that the method employed by Mr. Dausch to arrive at his determination were in common usage throughout the oil industry. His estimate was based on electric logs from eight wells in the area, two of which were stated as producing from the same reservoir, core samples therefrom and production data from the wells. It was stated that data with the results most favorable to the defendants was employed.
The volumetric limits of the reservoir was determined, and various estimates were used in determining the amount of oil and gas in place; thus porosity, percentage of connate water and the shrinkage factor were calculated in accordance with the data and experience available. Allowing another well its share from the reservoir, the total amount of minerals recoverable was estimated, using a conservative proportion as a recovery factor. This, however falls short of making the claim out to a sufficient legal certainty upon which to base an award, and the Courts of this state have never granted an award based on this type of calculation. The evidence adduced in this case leaves us unconvinced that the thorough analysis made by Mr. Dausch gives certain evidence as contended by counsel for the Aladdin group, and we think the following testimony of Mr. Dausch illustrates that his conclusions are not positive:
"Q. Now, isn't it true, Mr. Dausch, that production from salt domes area is a *486 very precarious type of production, that you can find oil in one spot and maybe move a few feet away and you won't find the same thing there?
"A. I think that's evidenced by the fact that the majority of these wells are dry holes; however, they always contribute some information to delineate what has already been established and that's the information that I used to delineate this reservoir.
"Q. But there is no absolute certain way that you can know just what the salt situation and what the oil situation and what the water situation is in the salt dome area?
"A. Yes, sir. Well, I think not in the area generally, but I think in the vicinity of this well that the data was sufficient for me to determine what the conditions were.
"Q. I have no other questions at this time."
Finally, it is interesting to note that more oil was produced after the casualty than before.
The other two items disallowed, however, should have been granted to the plaintiffs, for the evidence bears out that these were extra expenditures which resulted from the casualty. That the rentals of equipment which were not returned timely appeared to have been the fault of Rayburn rather than Aladdin, from the evidence in the record, since it was furnished for their use.
The evidence also reveals that $918.30 was paid to Aladdin Exploration Co. Inc.'s employee for overtime, in addition to his regular salary, and the plaintiffs are entitled to be recompensed for this amount.
The third-party defendant, Employers' Mutual Liability Insurance Company, was found liable to its insured, Rayburn Well Service, Inc. for the damages which the insured had to pay to the Aladdin group as a result of Rayburn's negligence in the rework operation. They reiterate the defenses made in the lower Court on this appeal, that there was no coverage under the insurance policy issued to Rayburn, because of the exclusionary clauses contained therein.
The policy proposed to insure the following:
"Coverage DProperty Damage LiabilityExcept Automobile. To pay on behalf of the insured all sums which the insured shall become legally obligated to pay as damages because of injury to or destruction of property, including the loss of use thereof, caused by accident."
This coverage is limited by certain exclusions one of which is found in endorsement No. 4.
"EXCLUSION OF PROPERTY DAMAGE LIABILITY ARISING FROM CERTAIN HAZARDS ENDORSEMENT
"It is agreed that such insurance as is afforded by the policy for Property Damage Liability with respect to operations being performed by the named insured and described in this endorsement does not apply to (a) blasting or explosion other than the explosion of air or steam vessels, piping under pressure, prime movers, machinery or power transmitting equipment, or (b) the blowout or cratering of any well, insofar as any of these injure or destroy property on or above the surface of the earth; provided that division (a) does not apply to "Oil Lease Operatorsall operations."

DESCRIPTION OF OPERATIONS
Gas Lease Operatorsnatural gas all operations * * *
Gasoline Recoveryfrom casing head or natural gas.
*487 Oil Lease Operatorsall operations * * *
Oil or Gas Well Shooting.
Oil or Gas Wellscleaning or swabbingby contractors.
Oil or Gas Wellsdrilling or redrilling, installation or recovery of casing."
The insurer contends that the casualty that occurred in this case was a "blowout" and thus not covered by the policy. The lower Court dealt with this contention in the following manner:
"2. The exclusion of policy coverage for property destroyed because of blowout of a well does not apply simply because there was no blowout.
"The evidence clearly reveals that the normal well head pressure of 3000 PSI of the short string was reduced to atmospheric pressure by filling the short string with a sufficiently weighted mud; that this mud was allowed to dissipate over a period of time during which the bottom hole pressure gradually ascended the short string tubing; that the valve atop the short string capable of resisting and closing off the normal pressure of the well was left open and that the normal pressure of the well, together with the freezing qualities of the gas that caused this normal pressure, was negligently allowed to come in contact with low pressure valves which it promptly froze and tripped causing a fire.
"Under such circumstances this Court finds it not necessary to invoke the rule set out in Creole Explorations, Inc., v. Underwriters, 245 La. 927, 161 So.2d 768. This was a fire caused by negligence not a blowout."
The third-party defendant does not dispute the facts in this regard, but argues that these facts show that a blowout occurred and to hold otherwise, was error as a matter of law. The case of Creole Exploration, Inc. v. Underwriters at Lloyd's, 245 La. 927, 161 So.2d 768 (1960) is cited for holding the following as the definition of blowout:
"A blowout occurs whenever the pressure from the formation overcomes the hydrostatic pressure exerted by mud column and forces formation fluids to the surface."
This definition was chosen by that Court over others and the defendants argue that the definition most favorable to the insured in this case would contain the following elements:
"1. That the well had been filled with drilling mud; 2. that the pressure of the gas at the bottom of the hole overcame the hydrostatic pressure of the mud; 3. that the bottom hole pressure cleaned out the hole rather suddenly and forcefully; and 4. the well went out of control."
All of which the defendant states are present in this case. It is further pointed out that representatives and employees of Rayburn Well Service, Inc., including Johnnie (Johnny) S. Rayburn and Donald Rayburn used the term "blowout" in the course of the trial.
However, as the opponents argument shows, the Creole case applied the above-quoted definition of blowout in conjunction with a holding that the interpretation most favorable to the insured must be applied and the above definition was the most favorable to the insured where the insurance policy in that case covered loss due to blowout. Withal, we would still be reluctant to apply another definition of blowout opposed to that given in the Creole case in order to favor the insured. Nonetheless, we are of the opinion that a blowout in this case was not present even under the Creole definition, or under the elements synthesized by counsel as being the most favorable to the insured in this case. In the Creole case the well blew out while being drilled. In this case the casualty occurred not merely from the bottom hole *488 pressure overcoming the hydrostatic pressure of the mud columb (regardless of how long it took in terms of time), but arose from the dissipation of the weighted mud pressure which (and what follows is the important consideration) allowed the pressure to gradually rise in the short string of tubing, thus setting the stage for the casualty which occurred by reason of the defendant's negligence in leaving the valves open so that the pressure was allowed to escape. Rather than by blowout, this loss was caused by controllable pressure which was vented to the atmosphere without proper safeguards by Rayburn. Concerning the Rayburn people's use of the term "blowout", the Creole case recognized that the term is used rather loosely in the oil industry.
But there is another consideration which precludes the application of this prescription. The endorsement excludes loss due to blowout in the course of the "described operations." The description involved here would be:
"Oil or Gas Wellscleaning or swabbingby contractors."

or
"Oil or Gas Wellsdrilling or redrilling, installation or recovery of casing."
It thus appears that re-work operations are not included in the described operations. Counsel for the insurer attempts to place it in the classification of re-drilling, and says that the terms are synonymous, but the record does not bear this out and the burden of proof is on the insurer to show that the exclusion applies. See Rachal v. Union National Life Insurance Company, 184 So.2d 775 (La.App. 1966). The most pertinent testimony as to what is involved in a re-work operation appears to be that of Mr. Noll:
"Remove both strings of tubing, then returning to your well with one string of drill pipe or tubing and squeeze, pump cement out of the 7-inch casing through these existing perforations in hopes that it will reach the place where the water is nor (sic) going and seal it off and in the upper zone you go through the perforations and seal off whatever route that the gas is entering. The well is not being successful and in this way we then would be back with an oil producing well on both strings, upper and lower."
This evidence, while admittedly vague, does not import what would be considered as re-drilling. In fact there was no drilling at all. The exclusion does not apply here.
The second exclusion raised as a defense by the insurer-third-party defendant states that the policy does not apply:
* * * "(j) under coverage D, to injury to or destruction of (1) property owned or occupied by or rented to the insured, or (2) * * * property used by the insured, or (3) * * * property in the care, custody or control of the insured or property as to which the insured for any purpose is exercising physical control, * * *."
The trial Court stated the following in holding that the exclusion did not apply, which we think is well-reasoned and cogent:
"The defenses raised by this Insurer are faulty:
1. "The exclusion of policy coverage because of property destroyed was in the care, custody or control of the insured or was property over which the insured exercised physical control does not apply herein.
"The only property of plaintiffs over which Rayburn exercised physical control and which was in the care, custody and control of Rayburn from the moment it placed its rig over the well until the fire was the short string of tubing.
"This is true physically since the only property of plaintiffs attached to Rayburn, *489 Inc., rig was the short string, and the only property of plaintiff receiving the attention and efforts of Rayburn, Inc., equipment and Rayburn, Inc., employees was the short string. This is also true as a matter of contract up to the time of the fire because to that time the only responsibility and duty of Rayburn, Inc. was to re-work the short string.
"The short string was not damaged, nor does plaintiff claim damages for it. The items of damage, or the damaged items, are those incidental to and/or adjacent to the contracted property that was physically under the care, custody and control of Rayburn, Inc., and the exclusion does not apply: Hooley & Sons v. Zurich, 235 La. 289; 103 So.2d 449."
The Hooley case had this to say about such an exclusion:
"The uniform jurisprudence holds that damaged property or premises merely incidental or adjacent to the contracted object upon which work is being performed by the insured is not within the `care, custody or control' of the insured for purposes of the exclusion clause in question, even though he might be permitted access thereto during the performance of his contract. Boswell v. Travelers Indem. Co., 1956, 38 N.J. Super. 599, 120 A.2d 250, Maryland Cas. Co. v. Hopper, Tex.Civ.App. 1950, 237 S.W.2d 411, Rex Roofing Co. v. Lumber Mut. Cas. Ins. Co., 1950, 280 App.Div. 665, 116 N.Y.S.2d 876, A. T. Morris & Co. v. Lumber Mut. Cas. Ins. Co., 1937, 163 Misc. 715, 298 N.Y.S. 227; Cohen v. Keystone Mut. Cas. Co., 1943, 151 Pa. Super. 211, 30 A.2d 203."
In that case it was held that the exclusion did not apply to damage to an urn at the base of a statue when the contractor's contract called for dismantling of the statue and the urn was damaged during such dismantling. The Hooley case was the substantial basis of a Federal Court decision applying Louisiana law, Mayronne Mud & Chemical Corp. v. T-W Drilling Co., 168 F.Supp. 800 (D.C.La., 1958), affirmed at 5 Cir., 272 F.2d 710. In holding that a similar exclusion did not apply, and that the insurer was liable, the Court stated:
"It is admitted that the interpretation herein placed on the words `occupied or used by' and `care, custody, or control' is not free from doubt. In fact, in some respects it may be at variance with their dictionary definitions. But dictionary definitions do not reflect the legal gloss to which these words have been subjected. Nor do they relieve the insurer of the burden of proving non-coverage under the exclusions in the policy. Home Benefit Association v. Sargent, 142 U.S. 691, 12 S.Ct. 332, 35 L.Ed. 1160; Board of Commissioners of Port of New Orleans v. Norwich Union Fire Ins. Soc., D.C., 51 F.Supp. 245; Massachusetts Protective Ass'n v. Ferguson, 168 La. 271, 121 So. 863; 29 Am.Jur. Insurance § 1444; 46 C.J.S. Insurance § 1321f. The insurer must, at its peril, make the policy exclusions clear and unmistakable. Home Benefit Association v. Sargent, supra; Board of Commissioners of Port of New Orleans v. Norwich Union Fire Ins. Soc., supra; Maryland Casualty Co. of Baltimore, Md. v. Beckham, 163 Miss. 836, 143 So. 886; Massachusetts Protective Ass'n v. Ferguson, supra; Boswell v. Travelers Indemnity Company, 38 N.J.Super. 559, 120 A.2d 250; Innis v. McDonald, Ohio Com. Pl., 150 N.E.2d 441, affirmed Ohio App., 150 N.E.2d 447. Otherwise, as here, there is coverage.
"The insurer was bound to know the type of business in which T-W, its assured, was engaged. Drilling wells off-shore is a highly integrated operation, participated in by various contractors who supply various types of personnel, material and equipment. If the insurer wanted to exclude from coverage the supplies and equipment furnished its assured *490 by other contractors, it should have said so in the policy, so that now it would not be reduced to taking refuge in generalities."
The Mayronne case involved damage from a blowout to a barge and its mud cargo. The insured, T-W Drilling Co. was in the process of drilling the well, and it unloaded mud from the barge, both of which were supplied by other parties. The insurer was liable for damage to both the barge and the mud. In view of what appears to be the Louisiana jurisprudence we are of the opinion that the trial Court's interpretation is correct. The type of operation involved in this case is the type of business engaged in by Rayburn. To accept the insurer's interpretation of the exclusion would virtually eliminate all liability insurance coverage for Rayburn's business, which would be an anomalous result indeed. If this were intended, the insurer should have indicated more specifically its intent, as indicated in the Mayronne case. This being our interpretation of the law of Louisiana on the subject, we feel it is not necessary to embark upon a discussion of the numerous cases from other jurisdictions cited by the parties. As for the words "of property as to which the insured for any purpose is exercising control," which the insurer contends was not present in the Hooley or Mayronne cases, we do not think that the addition thereof adds any new meaning to the exclusion. The facts that blowout preventors were attached to the well-head, that mud was pumped down both strings of tubing, and that rotary equipment was affixed to the strings, are argued to be indicative of control over property other than the short string of tubing. However, it is our conclusion that the control with reference to the insurance policy was, up to the time of the casualty, exercised only upon the short string of tubing, and the contacts Rayburn had with the other portions of the well was not care, custody or control or use, or occupation but was contact merely incidental to care, custody and control or use of the short string of tubing.
The policy also contained the following language relative to its undertaking a legal defense on behalf of the insured:
"II. Defense, Settlement, Supplementary Payments.
With respect to such insurance as is afforded by this policy, the company shall:
(a) defend any suit against the insured alleging such injury, sickness, disease or destruction and seeking damages on account thereof, even if such suit is groundless, false or fraudulent; but the company may make such investigation, negotiation and settlement of any claim or suit as it deems expedient;

* * * * * *
III. Definition of Insured. The unqualified word `insured' includes the named insured and also includes (1) under coverages B and D, any executive officer, director or stockholder thereof while acting within the scope of his duties as such, * * *"
The trial Court did not grant the prayer of the third-party plaintiffs, Rayburn Well Service, Inc., Johnnie (Johnny) S. Rayburn, and Donald Rayburn, for attorney's fees and expenses to defend the lawsuit, based on the refusal of the insurer to provide the legal defense and gave no reasons for this judgment. The appellee-insurer contends that it is not liable in this respect, because the insurer cannot be liable under the allegations of the original plaintiffs' petition and the facts adduced herein, since the exclusions precluded coverage for blowout or loss to property in the control of the insured,citing Smith v. Insurance Co. of State of Pennsylvania, 161 So. 2d 903 (La.App.1964).
However the "proof is in the pudding" in that the insurer was held under the facts. Insofar as the allegations of the original petition are concerned, the Smith case is *491 authority for the proposition that if an unambiguous exclusionary clause is applicable to the allegations of the petition, there is no duty to defend even though subsequent litigation results in the insurer being held liable under the policy coverage.
However this rule does not apply in this case, for two reasons. 1) As was clearly developed heretofore, the exclusionary clauses were not unambiguous; 2) The allegations of the petition were sufficiently broad to suggest that the insurer may be held liable even in the face of the exclusions, despite contention of the insurer to the contrary. In other words, the petition revealed that the defendants therein should be held for damages absent the finding of exclusive control or a "blowout". The prayer for attorney's fees and expenses should not have been denied in this matter. We note that Rayburn Well Service, Inc., Johnnie (Johnny) S. Rayburn and Donald Rayburn have argued to this Court that an award of attorney's fees and expenses should not be limited merely to those incurred in this suit, but should include those incurred in the consolidated case of Floyd Badeaux vs. Rayburn Well Service, Inc., et al, No. 7110 of the 29th Judicial District Court of the State of Louisiana. There was no appeal taken from the judgment in that case, and the question of attorney's fees and expenses incurred in that case is not before us.
Therefore, for the reasons hereinabove set forth, the judgment of the Court a qua rendered and signed on the 19th day of October, 1964, is reversed in the following respects:
(1.) In not allowing recovery to the plaintiffs Aladdin Exploration Company, Inc., and Hershey Oil Corporation against the defendants, Rayburn Well Service, Inc., Johnnie (Johnny) S. Rayburn, and Donald Rayburn for the sum of $1,210.23 representing rent paid for third-party service and equipment for extra time claimed by said plaintiffs; and (2). in failing to allow recovery to the plaintiffs, Aladdin Exploration Company, Inc. and Hershey Oil Corporation of the sum of $918.30, covering the cost of extra engineering time claimed by said plaintiffs; and it is decreed that there now be judgment in favor of Aladdin Exploration Company, Inc., and Hershey Oil Corporation and against Rayburn Well Service, Inc., Johnnie (Johnny) S. Rayburn and Donald Rayburn for said sums of $1,210.23 and $918.30, together with legal interest thereon from judicial demand until paid.
There is also judgment herein in favor of Rayburn Well Service, Inc., Johnnie (Johnny) S. Rayburn, and Donald Rayburn and against Employer's Mutual Liability Insurance Company for the said sums of $1,210.23 and $918.30, with legal interest thereon from date of judicial demand until paid.
It is further decreed that the judgment rendered herein by the Court a qua on October 19, 1964, dismissing the demands of Rayburn Well Service, Inc., Johnnie (Johnny) S. Rayburn, and Donald Rayburn against the Employers Mutual Liability Insurance Company for attorney's fees, costs, and expenses incurred for legal defenses in this litigation due them under the policy contract with said Employers Mutual Liability Insurance Company, is reversed and judgment is now rendered in their favor and against the said Employers Mutual Liability Insurance Company, recognizing their entitlement to such defense and the costs thereof, and the rights of said parties to proceed for recovery are reserved to them.
In all other respects the judgment of the Court a qua is affirmed.
All costs of this Court shall be borne by Rayburn Well Service, Inc., Johnnie (Johnny) S. Rayburn, Donald Rayburn, and Employers Mutual Liability Insurance Company.
Affirmed in part, reversed in part, amended and rendered.