HUGGS, INC., et al.,
Plaintiffs–Appellees,
Cross–Appellants,

v.

LPC ENERGY, INC.,
Defendant–Appellant,
Cross–Appellee.

G.E. HUGGS, d/b/a Exordium Oil & Gas Company, Plaintiff–Appellee,
Cross–Appellant,

v.

LPC ENERGY, INC.,
Defendant–Appellant,
Cross–Appellee.

HUGGS, INC., Plaintiff–Appellee,
Cross–Appellant,

v.

LPC ENERGY, INC.,
Defendant–Appellant,
Cross–Appellee.

No. 88–4822.

United States Court of Appeals,
Fifth Circuit.

Dec. 8, 1989.

Blake G. Arata, Ernest E. Svenson, Gordon, Arata, McCollam & Duplantis, New Orleans, La., James Fleet Howell, Katherine Clark Hennessey, Shreveport, La., for defendant-appellant, cross-appellee.

David Klotz, Bodenheimer, Jones, Klotz & Simmons, Shreveport, La., for plaintiffs-appellees, cross-appellants.

Before POLITZ, DAVIS, and DUHÉ, Circuit Judges.

DUHÉ, Circuit Judge:

McRae Exploration, Inc. (McRae) and Huggs, Inc. (Huggs) were parties to a letter agreement (the contract) and a Joint Operating Agreement (J.O.A.) relating to the exploration for and production of oil and gas. Huggs prepared both documents. Thereafter, LPC Energy, Inc. (LPC) succeeded to the rights and obligations of McRae under both the contract and the J.O.A.

The contract provided that Huggs would acquire mineral leases in the prospect area and assign them to McRae, which would drill and operate all wells. McRae was obligated to reimburse Huggs for the cost of acquisition plus 10% to cover additional overhead expenses. McRae had a 100% working interest until payout of the costs of drilling the wells but Huggs retained a 5% overriding royalty. After payout, the working interest became owned 80% by McRae and 20% by Huggs.

McRae lost Leases 290(a) and (b) because it failed to pay the required delay rentals and LPC lost Lease 245 because it failed to recommence drilling or reworking operations within ninety days after the cessation of production from the lease well. Huggs filed suit against LPC in federal district court, which had diversity jurisdiction over the parties, seeking damages for loss of the leases. Huggs' suit was consolidated with two other suits filed against LPC, one by Exordium Oil and Gas Company (holder of a ¹⁄₁₆ overriding royalty on all leases assigned to LPC) and one by Henry Goodrich, Gene Robinson and L.R. Brammer, Jr., (who, by unrecorded written agreement, had interests in the leases subject to the contract) along with Huggs, Inc. For purposes of this opinion, all plaintiffs will be designated as "Huggs." During the pendency of the litigation a fourth lease,

Lease 677, expired and Huggs added a claim for damages arising out of that loss.

Following a bench trial the district judge held LPC liable for lease acquisition costs for Lease 245 and Lease 677 and for lost profits and royalties on Lease 245. However, the court rejected Huggs' claim for damages for the loss of Leases 290(a) and (b). LPC appeals the trial court's findings as to Lease 245 and Lease 677. LPC also objects to the court's failure to hold a post-trial evidentiary hearing on the proper measure of damages. Huggs answers LPC's appeal and cross-appeals the trial court's rejection of its damage claim for LPC's loss of Leases 290(a) and (b).

*Standard of Review*

A trial court's factual findings should not be disturbed on appeal unless clearly erroneous. Fed.R.Civ.Proc. 52(a). However, the interpretation of a contract is a matter of law reviewable *de novo* on appeal. *City of Austin, Texas v. Decker Coal Co.*, 701 F.2d 420, 425 (5th Cir.), *cert. denied*, 464 U.S. 938, 104 S.Ct. 348, 78 L.Ed.2d 314 (1983). This broad standard of review includes the determination of whether the contract is ambiguous. *Id.* at 425. Thus as long as the contract as a whole is coherent, ambiguities can be resolved as a matter of law without looking beyond the four corners of the document. *Battig v. Hartford Accident and Indemnity Co.*, 608 F.2d 119, 120 (5th Cir.1979). In such cases a reviewing court is not bound by the clearly erroneous standard of review. *Carpenters Amended and Restated Health Benefit Fund v. Holleman Construction Co., Inc.*, 751 F.2d 763, 766 (5th Cir.1985).

*Applicable Law*

Louisiana law governs the resolution of this diversity dispute. The Louisiana Civil Code sets forth fundamental interpretive guidelines: interpretation of a contract is the determination of the common intent of the parties. La.Civ.Code art. 2045. When the words of a contract are clear and explicit and lead to no absurd consequences, no further interpretation may be made in search of the parties' intent. La.Civ.Code

art. 2046. The words of a contract must be given their generally prevailing meaning. La.Civ.Code art. 2047. Words susceptible of different meanings must be interpreted as having the meaning that best conforms with the object of the contract. La.Civ. Code art. 2048. A provision susceptible of different meanings must be interpreted with a meaning that renders it effective and not with one that renders it ineffective. La.Civ.Code art. 2049.

*Lease 290(a) and Lease 290(b)*

■ We will first address Huggs' claims on cross-appeal. Leases 290(a) and (b) were renewal top leases obtained by Huggs and assigned to McRae, which recorded them in March and May 1982. Each lease had a primary term of three years but required drilling operations or delay rentals in order for McRae to retain them. McRae did not initiate drilling activity and failed to pay delay rentals due in May 1983. LPC succeeded McRae as operator in January 1984 and failed to discover that delay rentals were not paid in 1983 or 1984 until it was contacted by Sugar Creek Producing Company, which acquired a lease on the property in 1985.

The trial court rejected Huggs' claim that the loss of Leases 290(a) and (b) and the failure to detect this loss constituted gross negligence and violated LPC's contractual duty to perform as a reasonable and prudent operator. We affirm the district court's finding that the exculpatory clauses of Paragraph IX of the contract and Paragraph 17 of the J.O.A. shield LPC from liability for loss of the leases.

Paragraph IX of the contract provides in pertinent part:

It is understood that [LPC] shall diligently attempt to make proper payments of delay rentals and shut-in gas royalty payments, but shall not be held liable to Huggs for the loss of a lease or interest therein through mistake or oversight if any delay rental or shut-in gas royalty payment is not paid or is erroneously paid.

The relevant portion of Paragraph 17 of the J.O.A. provides:

[LPC] shall diligently attempt to make proper payment, but shall not be held liable in damages for the loss of any lease or interest therein if through mistake or oversight any rental or shut-in payment is not paid or is erroneously paid. The loss of any lease or interest therein which results from a failure to pay or an erroneous payment of rental or shut-in payment shall be a joint loss and there shall be no readjustment of interests in the remaining portion of the Unit Area.

Article III of the contract imposes upon LPC the duty to act as "a reasonable and prudent operator."

Huggs argues that the trial court misapplied the burden of proof and made erroneous findings of fact. The trial judge's conclusion that the leases were not properly set up in McRae's records and thus never made it onto LPC's computer record of leases when the corporations merged is not clearly erroneous. Although no one witness could testify with certainty as to what exactly caused the failure to pay delay rentals, witnesses for LPC did testify that it made an investigation of the matter and came to the conclusion that the leases were never placed on McRae's computer files. The district judge accepted as reasonable LPC's explanation: "[there is] no better example of *oversight* than the situation where an operator overlooks a lease and makes the *mistake* of failing to put the lease on its delay rental records." (R. Vol. 2, p. 269). In *Columbia Gas Transmission v. Allied Chemical Corp.*, 652 F.2d 503 (5th Cir.1981), this court interpreted a similar exculpatory provision in a gas purchase contract. We held that under Louisiana law the term "inadvertence" includes "unintentional, though negligent, conduct." *Id.* at 509. The district court's finding regarding mistake and oversight is supported by the evidence and thus is not clearly erroneous. Huggs' argument that LPC could not benefit from the exculpatory language of Paragraph IX because its failure to pay delay rentals was intentional since LPC gave its lease records last computer priority when it succeeded McRae is without merit.

Similarly without merit is Huggs' argument that the trial court erred in finding "excusable" mistake or oversight. "Mistake" and "oversight" are not qualified in the contract. The contract as written is not ambiguous; thus this court has no authority to reach beyond the four corners of the document. La.Civ. art. 2046. *See Columbia Gas Transmission v. Allied Chemical Corp.*, 652 F.2d 503, 509 (5th Cir.1981). We will not rewrite the contract at this late date to accord with Huggs' present wishes.

In the same vein, Huggs argues that Paragraph IX requires that LPC prove that it made a diligent attempt at payment of delay rentals before the exculpatory portion of Paragraph IX inures to its advantage. This interpretation of the provision is contrary to fundamental rules of contract construction. In Louisiana a contract is to be read according to its plain intendment. *Battig v. Hartford Accident and Indemnity Co.*, 608 F.2d 119, 120 (5th Cir. 1979). The contract provision at issue in *Banner Chevrolet v. Wells Fargo Guard Services*, 508 So.2d 966 (La.App. 4th Cir. 1987), provided that the defendant would "do its best" to perform under the contract but would not be liable for damages caused by negligent acts or omissions or nonperformance of its obligations under the contract. The court rejected the plaintiff's argument that the phrase "do its best" in the exculpatory clause was a condition precedent to application of the clause. *Id.* at 968.

The district court in the case before us reasoned:

While the contract clearly obligates the operator to use due diligence in making delay rentals, it goes on to provide that the operator is not liable if any payment is not made through mistake or oversight. The contract does not use the language "not paid after diligent attempts" or "only if the operator has used due diligence will mistakes or oversights be excused."

(R. Vol. 2, p. 271). This interpretation of Paragraph IX is consistent with the Louisiana rule that a contract is to be construed against its drafter where the meaning of a contractual provision is in doubt. La.Civ.C. art. 2056. The district court's rejection of Huggs' claim for damages for LPC's loss of Leases 290(a) and (b) was therefore proper.

*Lease 245*

██ Lease 245 was beyond its primary term and was being held by production. However, the lease well went off production in early autumn 1984. Paragraph XI of the contract applies to a lease held by production:

In the event [LPC] elects not to maintain any lease within a proposed unit in effect by payment of delay rentals or drilling operations or to renew or extend to such lease then on or before 60 days of the earliest lease expiration or delay rental date on any lease on any unit, [LPC] shall relinquish and assign, free of liens and encumbrances, to Huggs all of such leases within such unit area and any leases therein and any wells drilled or caused to be drilled thereon shall no longer be subject to this agreement.

The district court held that Paragraph XI required LPC to notify Huggs that Lease 245 was in danger of lapsing, due to nonproduction, and that LPC's failure to notify or reassign the lease acreage to Huggs was a breach of contract. LPC contends first that Paragraph IX rather than Paragraph XI should control and thus that the exculpatory provisions of Paragraph IX apply. In the event Paragraph IX is found inapplicable, LPC maintains that the district court misinterpreted Paragraph XI in that LPC did not make an election as required by that paragraph. LPC also argues that Paragraph II(c) of the J.O.A. requires that the loss of any lease should be considered a joint loss and further argues that, in any event, Huggs had constructive notice that production from the lease well had ceased and therefore that the lease was in danger of lapsing.

LPC's argument that Paragraph IX of the contract, providing that LPC shall not be held liable to Huggs for loss of a lease or interest therein through mistake or oversight if any delay rental or shut-in gas royalty payment is not paid, was rejected

by the trial court. We agree with the district court's finding that this provision is inapplicable to a situation where a lease is lost because of any reason other than failure to pay or improper payment of delay rental or shut-in royalty. By the clear wording of Paragraph IX, it applies only to delay rental or shut-in royalty payments. Paragraph XI is expressly directed to the payment of delay rentals where there have been drilling operations; therefore, that specific provision controls. La.Civ.Code art. 2046. *See Fuller v. Phillips Petroleum Co.*, 872 F.2d 655 (5th Cir.1989).

LPC further argues that because the trial court specifically found that LPC was unaware of the cessation of production from Lease 245, LPC could not have made an "election" under Paragraph XI so as to invoke its applicability. However, the contract, requiring that LPC elect whether to keep a lease or not and then to notify Huggs of that election, places a heavy burden on LPC in favor of Huggs. As a prudent operator, LPC was required to keep current with the facts so that it could make a responsible decision concerning the election. LPC's own negligence prevented it from performing in accordance with the requirements of Paragraph XI. LPC cannot now argue that this negligence precludes the applicability of Paragraph XI. LPC's gross inattention to its duties, in essence, constituted an election. LPC's duty under Paragraph XI was in the nature of an alternative obligation. Its duty was either to (1) maintain the lease by delay rentals or drilling operations or (2) relinquish and assign all the leases within a unit area to Huggs 60 days before the lease expired. When LPC failed to maintain the lease by delay rentals or drilling operations, it was thereby required to relinquish and assign the leases; failure to do so constituted a breach of contract.

LPC contends that it gave Huggs "constructive notice" that Lease 245 was in danger of expiring because Huggs received monthly production reports, operating statements, and revenue checks from LPC Baker No. 1 well, the well which kept Lease 245 alive. LPC argues that examination of this information would have re-vealed that the well had stopped producing in commercial quantities prior to the lapse of Lease 245. Thus Huggs should have been on notice that the lease was in danger of expiring and should have acted to mitigate its damages.

However, the information Huggs received was equivocal at best. LPC billed Huggs for operating expenses at the producing well rate specified in the J.O.A. for every month from October 1984 to December 1986, but the well only produced for three of these 27 months. LPC sent monthly invoices to Huggs for those 27 months for direct labor, operations, pumper expense, lease maintenance, other repairs and maintenance, well service, and equipment rental. Furthermore, although Huggs received production checks from LPC showing diminution in production, those checks did not reach Huggs until two months after the month of production. By the time Huggs received the first check showing no production, Lease 245 had already expired and Sugar Creek Producing Company had purchased a lease on the lands covered by that lease. Consequently, any constructive notice Huggs might have had arrived too late for Huggs to act to remedy the consequences of LPC's negligence.

Finally, LPC argues that under Paragraph 2(c) of the J.O.A. the lapse of Lease 245 should be considered a joint loss. Paragraph 2(c) provides:

> If any lease or interest subject to this agreement be lost through failure to develop or because express or implied covenants have not been performed, or if any lease be permitted to expire at the end of its primary term and not be renewed or extended, the loss shall not be considered a failure of title and all such losses shall be joint losses and shall be borne by all parties in proportion to their interests and there shall be no readjustment of interest in the remaining portion of the Unit Area.

We adopt the trial court's analysis of this issue:

Paragraph 2(c) clearly states that if a lease is permitted to expire, the loss is not a failure of title, but is a joint loss which does not affect the assignment of interest between the parties. This provision does not override the relinquishment obligations of Paragraph XI for two reasons. First, *if* this provision of the operating agreement did contradict Paragraph XI of the participation agreement, the participation agreement—and not the operating agreement—would control. Second, the court finds no contradiction between the two agreements, but rather, that the provisions—Paragraph 2(c) of the operating agreement and Paragraph XI of the participation agreement—can be read without doing violence to either.

The court is obligated to give effect to all the provisions of a contract and to assume that all provisions were intended to have some meaning. La.Civ.Code art. 2049 (Rev.1984). A contract provision should be rendered nugatory only as a last result. La.Civ.Code art. 2049 (Rev. 1984). Here, the joint loss provision and the relinquished provision can both be given effect. The joint loss provision of Paragraph 2(c) is directed to the situation where both parties agree to the extinction of a lease. When the two parties do not agree, then Paragraph XI controls and the non-agreeing party must relinquish lease rights in the affected area. Thus, the notice and relinquishment provisions of Paragraph XI can be given effect along with the joint loss provision of Paragraph 2(c). The reasonable interpretation of the contract leads to the conclusion that, if after the Paragraph XI notice, the non-operator also desires that the lease not be maintained, then it becomes a joint loss under Paragraph h(c) [sic] of the operating agreement.

(R. Vol. 2, pp. 275–76). We thus reject each of LPC's arguments and affirm the district court's imposition of liability on LPC for loss of Lease 245.

*Exordium*

LPC also argues that the trial court erred in awarding damages to Exordium for loss of profits with regard to its over-riding royalty interest in Lease 245. LPC's argument is that there was no privity of contract between LPC and Exordium and therefore no breach of contract damages should have been awarded to Exordium.

■ Louisiana courts recognize that the same acts or omissions may constitute breaches of both general duties and contractual duties, giving rise to actions in both tort and contract. *Federal Ins. Co. v. Insurance Co. of North America,* 263 So.2d 871 (La.1972); *Franklin v. Able Moving and Storage Co., Inc.,* 439 So.2d 489 (La.App. 1st Cir.1983). Thus there are "contract situations where there occur damages by reasons of fault which are distinct from and/or in addition to breach of a conventional obligation." *Lafleur v. John Deere Co.,* 491 So.2d 624, 630 (La. 1986). *See also, Borden, Inc. v. Howard Trucking Co., Inc.,* 454 So.2d 1081 (La. 1983). Generally, where a person neglects to do what he is obligated under a contract, he has committed a passive breach of the contract. If he negligently performs a contractual obligation, he has committed active negligence and thus an active breach of the contract. A passive breach of contract warrants only an action for breach of contract; an active breach of contract, on the other hand, will also support an action in tort under La.Civ.Code art. 2315. *Hennessy v. So. Central Bell Telephone,* 382 So.2d 1044 (La.App.2d Cir.1980) (the unintentional failure of the telephone company to list a person's name in a directory does not give rise to an action in tort); *Reliance Trust v. Texas Gas Transmission Corp.,* 499 So.2d 202 (La.App.2d Cir.1986) (refusal to pay for gas under the terms of delivery contract was a passive act by the defendant and not any form of negligence or active breach that would serve as a basis for an award of tort damages). In interpreting Louisiana law on this point, this court asserted that "[i]t is the nature of the duty breached that should determine whether the action is in tort or in contract." *Kozan v. Comstock,* 270 F.2d 839, 844 (5th Cir. 1959) (malpractice suit is an action in tort, not contract).

The Louisiana Supreme Court recently spoke on the nature of fault under La.Civ. Code art. 2315:

> The framers conceived of fault as a breach of a preexisting obligation for which the law orders reparation, when it causes damages to another, and they left it to the courts to determine in each case the existence of an anterior obligation which would make an act constitute fault. (citations omitted)

*9 to 5 Fashions, Inc. v. Spurney,* 538 So.2d 228, 231 (La.1989).

■ In the instant case the pretrial order stipulated that the contract was subject to the right of Exordium to a one-sixteenth of eight eighths overriding royalty interest with respect to all leases subject to the contract. Certainly LPC was aware of Exordium's interest in the leases at the time it acquired them. The trial court found that LPC was grossly negligent with respect to its duties as operator of Lease 245:

> [T]his court finds that [LPC's] failure to notify Huggs, Inc. of the cessation of production amounts to gross negligence as that term is defined in Louisiana law. *See* La.Civ.Code art. 3556(13). The loss of production from any well, much less a well holding a mineral lease beyond its primary term, is not that [sic] an event about which an operator is allowed to be sanguine. It is an important event which demands immediate action, at best, and notification of one's partners, at least.

(R. Vol. 2, p. 280). The district court's finding of gross negligence is not clearly erroneous, and we will not disturb the imposition of liability upon LPC for damages sustained by Exordium. LPC had a general duty to act as a prudent operator. The risk of LPC's negligent loss of Lease 245 certainly had the potential to injure Exordium, and LPC was under a duty to protect Exordium against the type of damage that in fact occurred. *See, Pitre v. Opelousas General Hospital,* 530 So.2d 1151 (La. 1988).

### Lease 677

Lease 677 was in one of the two units being held by production from the LPC Baker No. 1 well, the well which also held

Lease 245. Lease 677 was paid up and did not lapse until January 1987, two years after LPC terminated its contract with Huggs and after Huggs had filed suit on Lease 245. Paragraph XI of the contract provided that when LPC elected not to maintain a lease in a unit, it must "relinquish and assign, free of liens and encumbrances, to Huggs all of such leases within such unit area." Under this provision the district court held LPC liable for its failure to relinquish and assign Lease 677 to Huggs when it allowed Lease 245 to lapse and ordered LPC to pay the costs Huggs incurred in re-acquiring acreage covered by Lease 677. This ruling was proper and will not be disturbed.

### Imposition of Damages

■ The trial court granted the plaintiffs damages for lost profits and lost royalties for the loss of Lease 245. LPC objects to this award on the basis that no Louisiana court has ever granted recovery for lost profits in an oil and gas case because such damage is difficult to ascertain to the required degree of legal certainty. LPC contends that the proof Huggs presented at trial is indistinguishable from that rejected as insufficient in the leading Louisiana case in this area of the law, *Aladdin Oil Co. v. Rayburn Well Service,* 202 So.2d 477 (La.App. 4th Cir.), *writ denied,* 251 La. 392, 204 So.2d 574 (1967).

Huggs' expert, a petroleum engineer, evaluated the actual flowing production data for gas and condensate from the Smith No. 1 well drilled by Sugar Creek Producing Company on the property formerly covered by Lease 245. The expert calculated the size of the reservoir by use of electric logs and core tests and used the unit areas established by the Office of Conservation. He applied tests approved by the Securities and Exchange Commission and the Society of Petroleum Engineers to the data gathered from Smith No. 1 well and segregated the zones into categories depending upon the likelihood of obtaining production from the zone: proved behind pipe, probable behind pipe, probable undeveloped, and possible undeveloped. The trial court chose to accept only the proved

behind pipe data in awarding damages because that figure is most conservative and most accurate. The expert used values at the exact prices paid in the field (even by LPC itself) at the time of the loss.

Although Huggs' expert utilized tests substantially similar to those used by the expert in *Aladdin,* we find that the facts of the instant case are distinguishable. *Aladdin's* expert tested wells removed some little distance from the blownout well; here Huggs' expert tested a producing well on the actual site formerly covered by Lease 245. Furthermore, the *Aladdin* court noted that the blownout well was located in a salt dome region, a geologic formation in which oil may be found in one spot but not in another a few feet away. The court even questioned whether in fact the plaintiff suffered any damage at all because the blownout well produced more oil after the accident than before. Thus it was not clear that the defendant's negligence caused the plaintiff any harm. Finally, the advances in technology in the twenty years since *Aladdin* lead to the conclusion that Huggs' expert's tests are more accurate.

Louisiana courts allow awards of damages for lost profits in oil and gas cases if the plaintiff proves such damage by a preponderance of the evidence. *Breaux v. Pan American Petroleum Corp.,* 163 So.2d 406 (La.App. 3rd Cir.), *writ denied,* 246 La. 581, 165 So.2d 481 (1964); *Bailes v. United States Fidelity & Guaranty Co.,* 512 So.2d 633 (La.App. 2nd Cir.1987). That Huggs was a lessee rather than a landowner does not render its claims speculative because Huggs' intent to have a well drilled on the Lease 245 site is evidenced by the alacrity with which it obtained an interest in the Smith No. 1 well. We find that the trial court's determination that Huggs proved its damages by a preponderance of the evidence is not clearly erroneous and that ruling will not be disturbed.

*Computation of Damages*

■ LPC argues that even if damages are awarded for loss of future oil and gas production, the trial court erred in refusing to hold a post-trial evidentiary hearing. At trial Huggs' expert lumped together losses from Lease 245 and Leases 290(a) and (b) and failed to discount the sum due to present value. In his memorandum opinion the trial judge asserted that there was nothing wrong with the plaintiffs' methodology and that he would require merely an additional submission from the parties on the issue of the proper discount figure. Although the court urged the parties to reach an agreement upon the proper discount figure, they failed so to do. The trial court denied the parties' requests for a post-trial evidentiary hearing and accepted instead Huggs' proposed discount factor.

LPC argues persuasively that the trial court erred in refusing to hold an evidentiary hearing in order to allow LPC to cross-examine Huggs' expert on the appropriateness of the discount factor he selected. The selection of a discount factor to be applied to a damages award is something more than a mere mathematical revision. It is a question of fact to be determined by the trier of fact. *Monessen Southwestern Ry. Co. v. Morgan,* 486 U.S. 330, 108 S.Ct. 1837, 100 L.Ed.2d 349 (1988). Inherent in the right to have the trier of fact determine the proper discount rate is the right to present evidence on the issue and to test the opposition's evidence by cross-examination. Therefore, the case must be remanded and an evidentiary hearing held to determine the appropriate discount factor to be used.

*Interest*

■ Finally, Huggs contends that the trial court's award of post-judgment interest was in error and that interest from the date of judicial demand should have been awarded. We agree. The question of legal interest in a tort action is substantive rather than procedural. *Williams v. Petroleum Helicopters, Inc.,* 234 So.2d 522 (La.App. 3rd Cir.), *writ denied,* 256 La. 371, 236 So.2d 501 (1970). Thus in a diversity case Louisiana law applies. *Aymond v. Texaco, Inc.,* 554 F.2d 206 (5th Cir.1977).

■ Huggs articulated theories of recovery in both contract and tort. Under contract theory, Huggs is only entitled to post-judgment interest; under tort theory, Huggs is entitled to prejudgment interest.

It is beyond dispute that Huggs is entitled to whatever damages the evidence proved appropriate. The trial court found that LPC breached its contract with Huggs and that, in breaching the contract, it committed gross negligence. Inasmuch as Huggs proved both theories it advanced, it is entitled to recover under both. *Franklin v. Able Moving & Storage, Inc.*, 439 So.2d 489 (La.App. 1st Cir.1983). Consequently, the trial court should have awarded interest from the date of judicial demand. La. Rev.Stat. 13:4203.

For the foregoing reasons, the trial court's decision is AFFIRMED IN PART, REVERSED IN PART and REMANDED for proceedings in accordance with this opinion.