**(110 So. 630)**

**Nos. 26965, 27050, 27510.**

**ROSENTHAL–BROWN FUR CO., Inc., v. JONES–FRERE FUR CO. et al.**

**SAME v. ORANGE–CAMERON LAND CO. et al.**

(Oct. 5, 1926. Plaintiffs' Rehearing Denied Nov. 29, 1926. Per Curiam, Dec. 2, 1926.)

*(Syllabus by Editorial Staff.)*

1. **Corporations** ⬤⟶30(2)—**Counter letter, recorded by purchaser, reciting that he held land in trust for subscribers in corporation to be formed held not acknowledgment that land belonged to subscribers individually or to corporation.**

Counter letter, recorded by purchaser of land, reciting that he held it and trapping lease thereon in trust for subscribers of stock in corporation to be formed, and that on completion of corporation he would convey to it, *held* not acknowledgment that land belonged to subscribers individually, none of whom were given fixed interest, nor that it belonged to corporation, since it was not in existence.

2. **Game** ⬤⟶3—**Conveyance held subject to prior trapping lease.**

Conveyance of land to corporation by purchaser *held* subject to extended lease of trapping rights granted by him before purchase when he owned exclusive right to trap thereon.

3. **Injunction** ⬤⟶46—**Grantees will be enjoined from further trapping on land conveyed where they knew that grantor had previously leased trapping rights.**

Grantees, who in bad faith trapped on land conveyed, knowing that grantor had previously granted extended lease of trapping rights thereon, will be enjoined from further trespass.

4. **Game** ⬤⟶3—**One trapping against will of landowner must account to owner for fruits (Rev. Civ. Code, arts. 1965, 3415).**

One who unlawfully traps wild game against will of owner of land must account to owner for all fruits of such trapping, in view of Rev. Civ. Code, art. 1965, notwithstanding that under section 3415, landowner does not own wild animals, and one not forbidden to go on land to hunt and trap may lawfully do so.

5. **Game** ⬤⟶3—**Grantee trapping on land in bad faith held liable to prior lessee of trapping rights for profits (Rev. Civ. Code, art. 501).**

Grantee of land who in bad faith trapped thereon *held* liable to prior lessee of trapping rights for difference between gross proceeds and expenses of trapping, being entitled to reimbursement for expenses, in view of Rev. Civ. Code, art. 501.

6. **Game** ⬤⟶3—**Parties engaging in wrongful trapping operations for joint benefit held liable in solido.**

Where wrongful trapping operations were for joint benefit of two defendants, they were joint trespassers, liable in solido.

Appeal from Fourteenth Judicial District Court, Parishes of Cameron and Calcasieu; Thomas F. Porter, Jr., Judge, and E. R. Kaufman, Judge ad hoc.

Suits by the Rosenthal-Brown Fur Company, Inc., against the Jones-Frere Fur Company and another, and against Orange-Cameron Land Company and another. Judgments for plaintiff, and defendants in the first case take a devolutive appeal, and those in the second case take a suspensive appeal. Judgment in first case affirmed. Judgment in second case reduced and affirmed.

Pujo & Bell, of Lake Charles, and Fred L. Williams, of Houston, Tex., for appellant Orange-Cameron Land Co.

Donelson Caffery, Paul A. Sompayrac, and Anna C. McCay, all of New Orleans, for appellant Jones-Frere Fur Co., and for heirs of Hugh P. Frere.

Cline & Plauche and Cullen R. Liskow, all of Lake Charles, for appellee.

ST. PAUL, J. One phase of these cases has already been before this court as No. 26989 of its docket (Rosenthal-Brown Fur Co. v. Jones-Frere Fur Co. et al., 157 La. 887, 103 So. 251); but that feature is no longer of consequence here, except that the four volumes of pleadings and evidence therein filed have been made part of these consolidated cases and thus added to the other six volumes filed under the above three numbers.

## I.

Case No. 26965 is a devolutive appeal taken by the Jones-Frere Fur Company and the Orange-Cameron Land Company, hereinafter called the defendants, from a judgment rendered after due trial on the merits, granting the Rosenthal-Brown Fur Company, hereinafter called the plaintiff, a permanent injunction restraining said defendants from trespassing upon and trapping fur-bearing animals off a certain tract of marsh lands, hereinafter called the *Joyce tract*, being about 30,000 acres in Cameron parish.

Transcript No. 27050 is merely a supplementary transcript in the same appeal.

The injunction was sought on the one hand, and resisted on the other, because each party claims the exclusive right to trap fur-bearing animals on said lands.

## II.

Case No. 27510 is a suspensive appeal taken by the Orange-Cameron Land Company and the Jones-Frere Fur Company from a judgment rendered in a second suit filed by plaintiff, which awards plaintiff damages against both defendants in solido for having illegally trapped a large number of fur-bearing animals off said lands; in which suit said defendants have reconvened and on their part are asking damages from plaintiff, likewise for having illegally trapped on said lands. For *both* parties have been trapping thereon.

## III.

So that, stripped of all extraneous matters, these cases present only two main questions for decision, to wit: (1) Which of the parties, plaintiff or defendants, is entitled to the exclusive right to trap on said lands; and (2) what is the measure of damages for the violation of that right by the other party? And here it may be mentioned incidentally that defendants in their brief of March 25, 1926 (pp. 13, 14), measure their damages by exactly the same standard which, throughout their other briefs, they contend is *not* the measure by which plaintiff is entitled to recover (if entitled to recover at all). But that is neither here nor there; the measure of damages is what the law fixes or contemplates and not what the litigants may declare it to be.

## IV.

The facts of these cases, as we find them, are as follows:

On May 23, 1923, one F. J. Pavell owned the exclusive right to trap fur-bearing animals off some 100,000 acres of marsh lands in Cameron Parish, including the aforesaid Joyce tract of 30,000 acres, and on that day he ceded his said right to plaintiff for a period of two years for a certain consideration (royalties on the catch). On December 27, 1923, he extended plaintiff's rights for three years longer.

Meanwhile Pavell, who was himself only a lessee of the Joyce tract, sought to buy that tract from the owner thereof, the North American Land Company, of Lake Charles. Accordingly, on December 11, 1923, a deed thereof to himself was prepared in *notarial form*, which recited that the company sold and Pavell purchased the land for $90,000; of which $30,000 was declared to have been paid in cash and Pavell's notes furnished for the balance. The deed, as prepared, contains also a recital that whereas $25,000 of the cash portion was furnished by one H. J. L.

Stark, therefore the latter was to be protected, in case of foreclosure or other "repossession" of the land by the vendor, to the extent that, in that event, Stark was to get from the vendor a deed to a certain 7,000 acres thereof.

Apparently, however, Stark failed to put up the $25,000 at that time, for the notarial act was not completed. It was duly signed and acknowledged *by the vendor only* (and some part of the cash portion of the price may have been paid), but instead of the act being retained and duly deposited and registered by the notary, as it should have been if a notarial act (Act 48 of 1890, p. 40; R. C. C. 2251, 2252), it was retained by the vendor as a deed poll and put in escrow with a bank in Orange, Tex., where it remained until January 2, 1924.

On that day the cash portion of the purchase price (or balance thereof) was paid to the bank and the deed then taken out of escrow and thereupon signed and acknowledged by the purchaser (at Orange, Tex.).

The cash portion of $30,000 was furnished as follows: Pavell $10,000; Stark $10,000 (only); one D. D. Blue $5,000; and five others $1,000 each, including the cashier of the bank at Orange, who caused said deed to be duly recorded and at the same time recorded a so-called counter letter as hereinafter mentioned.

[1] The so-called counter letter recited that, whereas said lands had been sold to Pavell (as aforesaid), and whereas Pavell was then engaged in forming a corporation (name, domicile, and capital not stated), and whereas the above-mentioned parties had become subscribers for the stock of said corporation to the amount above stated, therefore he (Pavell).acknowledges that he held said lands together with the trapping leases thereon in trust for the above-mentioned subscribers *and such others as might be secured,* in the proportions set out opposite their names; *for the purpose of forming a corporation,* and

would upon completion of said corporation assign and convey to it all his right, title, and interest in said lands upon said corporation assuming the indebtedness thereon.

### V.

This so-called counter letter was clearly *not* an acknowledgment that the lands belonged to the subscribers individually, for none of them was given any fixed interest therein or interest which could not be materially and indefinitely diminished by the adding of new subscribers, and no such *elastic* title to lands or to anything else is known in this state or anywhere else; a title or right which may be diminished at the will and by the independent act of any and every person whomsoever is simply no title or right at all. Moreover, the very acknowledgment itself seems quite clear that Pavell held the title *not* for the subscribers individually but only for the purpose of conveying it to the proposed corporation.

And on the other hand it was not an acknowledgment that the property belonged to the corporation which had not yet come into being, and possibly never would. A property right cannot for the time being exist in some one who has not, and may never have, any existence; and, moreover, non constat, that the corporation, if it should ever come into being, would consent to assume and become liable for the indebtedness on the land.

Our appreciation of this so-called counter letter is that it was nothing more than an undertaking on the part of Pavell to convey the lands to the proposed corporation "if, when, and as" formed (to borrow an expression from the language of the stock exchanges). In other words it was a mere offer to convey the lands to such a corporation if formed, and if willing to take the lands and assume the indebtedness thereon. All of which then lay in the lap of the gods.

[2] Hence our conclusion is that the lands belonged to Pavell until he conveyed them

later on, in the summer of 1924, to the corporation which had then just been formed (Orange-Cameron Land Company), and that this corporation then acquired the lands subject to the extended lease which Pavell had granted to plaintiff. The district judge (Kaufman) so concluded also.

## VI.

[3] We are satisfied that defendants were, both in law and in fact, in bad faith when they attempted to, and did, trap on the lands notwithstanding the lease granted to plaintiff by Pavell. The district judge (Porter) thought the same. Doubtless they knew (at any rate, some of their directors knew), even before they began their operations, all the facts hereinabove recited. But in any event they were fully informed thereof by the hereinabove mentioned injunction suit filed against them by plaintiff before the opening of the trapping season.

Hence the only question remaining is how much in damages plaintiff is entitled to recover of defendants.

## VII.

[4] It is quite true that one does not own the wild animals which stray into his field, and, accordingly, he cannot claim such animals from another merely because they may have been killed or captured on his land. So says the law. R. C. C. 3415.

But this is very far from saying that one may not establish exclusive game preserves on his own land, or that another may come upon his premises and kill or capture at his pleasure the wild animals thereon, and that the owner has no redress except vi et armis or through a belated (and hence ineffective) injunction.

The true rule is this, that the wild animals upon the land do not belong to the owner thereof ratione soli; hence one who has not been forbidden to go upon the land of another may lawfully exercise the right (which otherwise belongs to the owner alone) to hunt and trap thereon and may therefore keep for himself *the fruits of a right lawfully exercised*, the owner of the land presumably consenting because not objecting.

But one who unlawfully, and against the will of the owner of the land, exercises thereon rights belonging exclusively to the owner, must account to such owner for all the fruits of his unlawful exercise of that right (Gulf Refining Co. v. Hayne, 148 La. 340, 346, 86 So. 891; R. C. C. 501; Allies Oil Co. v. Ayers, 152 La. 19, 21, 22, 92 So. 720); this being in accord with the moral maxim of the law that "no one ought to enrich himself at the expense of another." R. C. C. 1965.

And neither that rule, nor its application here, is peculiar to this state or even to the civil law whence it is derived.

In Garcia v. Gunn et al., 119 Cal. 315, 51 P. 684, plaintiff had acquired from the Mexican government the exclusive right to capture and kill (in moderation) the wild goats on Guadalupe Island, off the Pacific Coast of Mexico; and defendants had trespassed on said island and killed a large number of goats and carried off their skins. Plaintiff sued to replevin some 4,000 of their hides, and the Supreme Court of California thereupon said:

"It is claimed by defendants that plaintiff had no right * * * to any specific goats; that, while he had the right to utilize and kill some of them, and in moderation, he did not have the right to all of them, or to any particular ones, and that, even though defendants were wrongdoers, the action of replevin would not lie, * * *; that the remedy, if there be any, is for trespass. [But] *plaintiff was given dominion over all the goats, with the right of selection for the purpose of killing or other utilization. This was a right to the immediate possession of all the goats. It was not necessary that he should have the absolute ownership of all of them.* * * * It certainly cannot be claimed that defendants could go upon that island, and kill 8,000 goats, and carry away their skins (as it appears was done), without materially disturbing plaintiff's right of possession and selection. While trespass would lie, we do not think plaintiff is confined to that remedy. * * * Where plaintiff had a right to the use of the property at will, he had the right to replevy it from a wrongdoer." (Italics ours.)

The case of Sherwood v. Stephens, 13 Idaho, 399, 90 P. 345, relied upon by defendants, has no application. That was an action against a game warden for the value of (stocked) fish escaped from an artificial pond, the barriers whereof had been destroyed by the warden. But plaintiff had *declined to plead* that said barriers had not been erected in violation of a law which forbade the erection of obstructions in streams to impede the free passage of (other) fish going up and down to their natural feeding grounds.

[5] Our conclusion is that defendants must account to plaintiff for the profits they derived from the unlawful exercise of a right which belonged exclusively to plaintiff. These profits were the ill-gotten gains of their unlawful act, done to the manifest prejudice of plaintiff's right, and the least they should be called upon to do is to restore them.

### VIII.

The question whether a possessor be in good faith or in bad faith (legal or actual) is the sole factor in determining whether such possessor should or should not account for the fruits of his possession. But it is not a factor at all in determining what those fruits may be. Those fruits are the *profits* which the possessor has derived from his possession. If he was in good faith he has nothing to restore (R. C. C. 502); but even the possessor in bad faith is entitled to reimbursement for the expenses incurred in producing the fruits for which he must account to the owner (cf. St. Paul v. La. Cypress Lumber Co., 116 La. 585, 595, 596, 40 So. 906); for the harsh rule of the the common law does not prevail in this state. R. C. C. 501. Accordingly, we think the trial judge (Porter) erred in refusing to allow defendants credit for these expenses. See, also, Ring v. Schilkoffsky, 158 La. 361, 104 So. 115.

### IX.

For the rest, the trial judge, who saw and heard the witnesses and referred all the accounts to an expert for further investigation, concluded that defendants had rendered a true and honest account of the result of their trapping operations on the land in controversy; and nothing has been said in brief or in argument or appears from the record which would lead us to conclude that he erred. He thus found that the gross proceeds of defendants' catch was $33,227.46, for which amount he gave judgment. But, as we said above, he should have allowed defendants credit for their expenses. The total of these was $19,771.97 (to wit, $13,829.57 as the share of the trappers and $5,942.40 for other necessary items); which amount should be deducted from the gross proceeds, thus leaving a profit of $13,455.69, for which judgment should have been rendered.

[6] And as the trapping operations were carried on for the joint benefit of both defendants (25 per cent. of the gross to the one and 75 per cent., less expenses, to the other), they were clearly joint trespassers and therefore liable in solido; and the trial judge properly so condemned them.

### Decree.

It is therefore ordered that the judgment appealed from in the injunction suit (No. 513 in the court below, and Nos. 26965 and 27050 in this court) be affirmed. And it is further ordered that the judgment appealed from in the damage suit (No. 522 in the court below and No. 27510 in this court) be amended by reducing the amount therein allowed plaintiff to $13,455.69), and that as thus amended said judgment be affirmed; plaintiff to pay costs of appeal in transcript No. 27510, and the defendants to pay costs of appeal in transcripts Nos. 26965 and 27050 and all costs of the court below in both cases.

O'NIELL, C. J., is of the opinion that the measure of damages is the plaintiff's loss, not necessarily the defendants' gain.

PER CURIAM. After a rehearing was granted on the defendants' application, restricted to the question of liability of the plaintiff for royalties and the amount there; of, the plaintiff filed in this court an acknowledgment of liability for royalties to the amount of $2,052.59, which is all that the defendants claimed, and the plaintiff now requests that the judgment, which was reduced to $13,455.69 by the decree of this court on the 5th of October, 1926, be further reduced to $11,403.10, and that a copy of the decree be sent forthwith to the district court for execution.

It is therefore ordered and decreed that the judgment aforesaid against the defendants is hereby reduced to $11,403.10, which bears interest at 5 per cent. per annum from judicial demand, and, as thus reduced in principal, the said judgment is now made the final decree of this court.