# United States Court of Appeals for the Fifth Circuit

United States Court of Appeals
Fifth Circuit

**FILED**

January 18, 2022

Lyle W. Cayce
Clerk

No. 21-30195

Cynthia Sue Mary; Paul's Land Company, L.L.C.,

*Plaintiffs—Appellants*,

*versus*

QEP Energy Company, formerly known as Questar Exploration & Production Company,

*Defendant—Appellee*.

Appeal from the United States District Court
for the Western District of Louisiana
USDC No. 5:13-CV-2195

Before Davis, Higginson, and Engelhardt, *Circuit Judges*.

W. Eugene Davis, *Circuit Judge*:

This case is before us for the second time.[1] Plaintiffs are landowners who brought this action after defendant installed two pipelines on their property partially outside the boundary established in the parties' servitude agreement. The only issue before us is whether, as a consequence of this encroachment, plaintiffs are entitled to disgorgement of all profits defendant

---

[1] For our prior opinion, see *Mary v. QEP Energy Co.*, 798 F. App'x 811 (5th Cir. 2020) (unpublished).

earned from the gas that flowed through the pipelines. We conclude that the most they could recover are the additional profits defendant earned as a direct result of the encroachment, as compared to the profits it would have earned if it had installed the pipelines entirely within the servitude. Because plaintiffs have no evidence of such additional profits, we AFFIRM the district court's summary judgment in favor of the defendant.

## I.    BACKGROUND

Plaintiffs-Appellants Cynthia Sue Mary and Paul's Land Company, LLC (together, the "Marys") co-own approximately 160 acres located in Bienville Parish, Louisiana. In 2006, the Marys entered into an oil and gas lease that was later assigned to Defendant-Appellee QEP Energy Company ("QEP"). The lease granted QEP the right to explore for and develop natural gas on the Marys' property. The Marys and QEP entered into several other agreements over the following years that allowed QEP to install various works on the Marys' property, including multiple pipelines.[2] This appeal focuses on two of those pipelines, which we refer to as the "Pedro Pipelines."

In 2011, the Marys and QEP entered into a pipeline servitude agreement that allowed QEP to install the Pedro Pipelines in a specific, defined area on the Marys' property. The two Pedro Pipelines connected production from the Pedro Well, located on adjacent property not owned by the Marys, to a pair of pipelines QEP had previously installed on the Marys' property ("Mary Pipelines").[3] The Pedro Pipelines carried gas and saltwater extracted from the Pedro Well to the junction with the Mary Pipelines, which would then transport the products off the Marys' land and to the ultimate

---

[2] QEP paid the Marys amounts exceeding $250,000 for these subsequent agreements.

[3] The Mary Pipelines are connected to the Mary Well, which is also located on the Marys' property. QEP owns the Mary Pipelines and the Mary Well.

No. 21-30195

destination. The servitude for the Pedro Pipelines is 40 feet wide and shaped like the letter "L." However, the Pedro Pipelines "cut the corner" of the servitude boundary such that approximately 31 feet of one pipeline and 15 feet of the other were outside the servitude.

The Marys sued QEP in state court for various forms of relief arising out of the installation of the Pedro Pipelines partially outside the servitude. The Marys asserted that, pursuant to Louisiana Civil Code Article 497, they may elect either to keep the encroaching segments of the pipelines or require QEP to remove them at its expense. They also sought disgorgement of all profits QEP earned from the gas that flowed through the Pedro Pipelines or, alternatively, fair rental value for using them, plus any additional relief to which they were entitled.

QEP removed the case to federal court based on diversity. It then filed a motion for partial summary judgment challenging the Marys' claim for disgorgement of profits and right to require QEP to remove the pipelines. In 2017, the district court granted the motion on the ground that the Marys produced no evidence that QEP acted in bad faith under Civil Code Article 670, which it concluded was a necessary element of the Marys' disgorgement and pipeline removal remedies. The parties subsequently settled the remainder of their dispute, and the Marys appealed the summary judgment.

In 2020, a panel of this Court held that the district court erred when it relied on Article 670 to determine whether QEP acted in good or bad faith. The Court reversed and remanded with the following instruction:

> [T]he district court should determine whether QEP's intrusion into Plaintiffs' land sounds in trespass, in accession, or in some other provision of Louisiana law. *See, e.g.*, *Aertker v. Placid Holding Co.*, No. 07-473, 2012 WL 4472002, at *5–*6 (M.D. La. Sept. 27, 2012) (discussing the appropriate cause of action

3

No. 21-30195

for recovery of damages related to an errant pipeline). It should then apply the relevant definition of bad faith (if the applicable cause of action requires such a showing) and decide whether Plaintiffs are entitled to a disgorgement of profits.[4]

On remand, the parties filed cross motions for summary judgment. The district court issued a written ruling where it considered three potential causes of action that could form the basis of a disgorgement award: accession, breach of contract, and trespass. Regarding accession, the court observed that Civil Code Article 487 requires a "bad faith" possessor "to restore to the owner the fruits he has gathered, or their value, subject to his claim for reimbursement of expenses." However, the court determined that it did not need to decide whether QEP was a bad faith possessor, because (1) gas and other minerals extracted from the ground are not "fruits"; (2) even if natural gas or its proceeds were considered "fruits," a landowner may only claim by accession the fruit from its own land, and the gas in the Pedro Pipelines came from the Marys' neighbor's land; and (3) the Marys failed to show that QEP realized any additional profit as a result of the misplaced pipelines. The district court then held that disgorgement is not a remedy for either trespass or breach of contract under Louisiana law, even if QEP was in bad faith. Finally, the district court struck several other claims and remedies, as well as a pair of supplemental affidavits from the Marys' experts.

Accordingly, the district court granted summary judgment in favor of QEP and against the Marys. The Marys timely appealed.

---

[4] *Mary*, 798 F. App'x at 813-14.

No. 21-30195

## II.    STANDARD OF REVIEW

"We review the grant of a motion for summary judgment *de novo*, applying the same standard as the district court."[5] Summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."[6] A fact is material if it might affect the outcome of the suit, and a factual dispute is genuine if a reasonable jury could return a verdict for the nonmoving party.[7]

## III.    DISCUSSION

Louisiana law provides the substantive rule of decision in this diversity case.[8] Thus, "our quest begins with the Civil Code of Louisiana and the definitive holdings of the Louisiana Supreme Court."[9] If that court has not spoken on a particular issue, then we must make an "*Erie* guess" as to what that court would most likely decide.[10] Our task is to attempt to predict state law, not create or modify it.[11]

The only issue we must decide is whether the Marys are entitled to disgorgement of the profits QEP earned from the gas that flowed through the Pedro Pipelines.[12] The Marys contend that QEP's misplacement of these

---

[5] *Moss v. BMC Software, Inc.*, 610 F.3d 917, 922 (5th Cir. 2010) (citation omitted).

[6] Fed. R. Civ. P. 56(a).

[7] *Thomas v. Tregre*, 913 F.3d 458, 462 (5th Cir. 2019).

[8] *See Terrebonne Par. Sch. Bd. v. Columbia Gulf Transmission Co.*, 290 F.3d 303, 317 (5th Cir. 2002).

[9] *Burns v. Gleason*, 819 F.2d 555, 556 (5th Cir. 1987).

[10] *Terrebonne Par. Sch. Bd.*, 290 F.2d at 317.

[11] *Id.*

[12] The Marys raise several other arguments in their appeal, but none of these require lengthy discussion. The Marys argue that the district court erred when it struck and refused to consider a claim regarding the Mary Pipelines and remedies other than

5

pipelines partially outside the servitude boundary created liability under Louisiana property law, under the contract, and for trespass. They further argue that disgorgement is available under all three legal theories. We examine below whether the Marys are entitled to disgorgement in this case under any of the theories asserted.

### A.    Property Law (Accession)

The Marys' primary argument relies on the concepts of accession and fruits under Louisiana property law. There are two steps to their reasoning. First, the Marys claim to own by accession those parts of the Pedro Pipelines that are outside the servitude boundary. Second, when QEP used what the Marys contend is their pipeline without their permission to transport gas, it unlawfully exercised a right that belonged exclusively to the Marys; therefore, QEP must account to the Marys for the "fruits" of this unlawful use. Those fruits, they urge, are the profits QEP earned from the gas that passed through the Pedro Pipelines, because the gas would not have reached market (and, consequently, would have no value) if it had not passed through the segment of the pipeline the Marys allegedly own by accession, however short that segment may be.

Louisiana law supports the first part of the Marys' argument.

---

disgorgement (e.g., fair rental value and non-pecuniary damages). However, we hold for essentially the reasons stated by the district court and argued by QEP that this claim and these remedies were released by the parties' settlement and are outside the scope of the mandate in the prior appeal. We also note that the Marys' counsel expressly disavowed at oral argument the right to demand removal of the encroaching portions of the Pedro Pipelines. The Marys also contend that the district court erred when it excluded on remand two supplemental affidavits that it had previously denied as untimely when it considered QEP's first motion for summary judgment in this case. The Marys did not complain about that ruling in their first appeal; therefore, the Marys waived this argument. *See Medical Ctr. Pharmacy v. Holder*, 634 F.3d 830, 834 (5th Cir. 2011) ("[T]he waiver doctrine . . . holds that an issue that could have been but was *not* raised on appeal is forfeited and may not be revisited by the district court on remand.").

Accession is introduced in Article 482 of the Civil Code, which declares that "[t]he ownership of a thing includes by accession the ownership of everything that it produces or is united with it, either naturally or artificially, in accordance with the following provisions."[13] When a "bad faith" possessor erects a "construction" on the property of another, the landowner may elect to keep it for himself, although "he is bound to pay at his option either the current value of the materials and of the workmanship . . . or the enhanced value of the immovable."[14] "Bad faith" in this context is implicitly defined in Article 487, which states:

> For purposes of accession, a possessor is in good faith when he possesses by virtue of an act translative of ownership and does not know of any defects in his ownership. He ceases to be in good faith when these defects are made known to him or an action is instituted against him by the owner for the recovery of the thing.[15]

Although the Marys consented to the construction of the Pedro Pipelines on their property within the boundaries identified in the pipeline servitude, they did not consent to the installation of pipelines outside these boundaries. Because there was no servitude, contract, or other "act translative of ownership" that allowed QEP to place its pipelines outside the servitude, QEP was in "bad faith" under Article 487 once it became aware that the pipelines were outside the servitude or when the Marys brought this action. Thus, the Marys may take ownership of the out-of-bounds segments

---

[13] LA. CIV. CODE art. 482.

[14] LA. CIV. CODE art. 497. Article 497 provides other remedies to the landowner, but none of those remain available to the Marys. *Supra* note 12.

[15] "Bad faith" is defined differently in other contexts. *See, e.g.*, LA. CIV. CODE art. 487 revision cmt. (c); *id.* art. 1997 revision cmt. (b) & editor's note.

No. 21-30195

of the Pedro Pipelines, subject to QEP's claim for reimbursement for the current value of the materials and workmanship or the enhanced value of the land.[16]

Turning to the second part of the Marys' argument, their claim to QEP's profits stems from the Civil Code articles governing the ownership of "fruits," which are things "produced by or derived from another thing without diminution of its substance."[17] The default rule is that the owner of a thing owns by accession the fruits of that thing.[18] However, a good faith possessor may keep the fruits he has gathered, while "[a] possessor in bad faith is bound to restore to the owner the fruits he has gathered, or their value, subject to his claim for reimbursement of expenses."[19] Article 487, quoted and discussed above, provides the standard for good and bad faith in this context as well.[20]

As the district court observed, gas is not a fruit; it is a product.[21] Under

---

[16] *See id.* art. 497. We note that there is no evidence that the Marys have reimbursed QEP as required by Article 497. QEP may retain possession until this occurs. *Id.* art. 529.

[17] *Id.* art. 551. The Code categorizes fruits into two types, "natural" and "civil," the latter being "revenues derived from a thing by operation of law or by reason of a juridical act, such as rentals, interest, and certain corporate distributions." *Id.*

[18] *Id.* art. 483.

[19] *Id.* art. 486.

[20] *See Lemoine v. Downs*, 125 So.3d 1115, 1119 (La. App. 3 Cir. 2012) (applying Article 487 to determine whether a possessor was in bad faith and had to return fruits of the property); John A. Lovett, *Good Faith in Louisiana Property Law*, 78 La. L. Rev. 1163, 1203-04 (2018).

[21] La. Civ. Code art. 551 revision cmt. (c) ("Mineral substances extracted from the ground and the proceeds of mineral rights are not fruits, because their production results in depletion of the property." (citation omitted)); Lee Hargrave, *Review of Recent Developments: 1991-1992, Property*, 53 La. L. Rev. 953, 953 (1993) ("Royalties and other production payments, however, are paid upon removal of oil and gas from the ground and are not fruits." (footnote omitted)).

No. 21-30195

Article 488, a landowner may recover products taken from his land without his consent,[22] but the gas at issue here was not taken from the Mary's land. It was produced from the Pedro Well, located on the neighbor's land.[23] Likewise, even if the gas or its proceeds were considered a "fruit," the Code does not support the Marys' position that they are fruits of anything the Marys own.[24] Therefore, we see no clear path to disgorgement under the plain language of the Code.

The Marys direct our attention to two Louisiana Supreme Court cases that they argue interpreted "fruits" more broadly.

The first case, *Rosenthal-Brown Fur Co. v. Jones-Frere Fur Co.*, concerned a dispute over the right to trap wild animals on a tract of land.[25] After determining that the plaintiff held exclusive trapping rights, the court addressed what damages it could recover from the defendants, who trapped on the land even after the plaintiff protested and sued for an injunction.[26] Relying on the Civil Code's "fruit" articles, the court held that "one who

---

[22] LA. CIV. CODE art. 488; 2 A.N. YIANNOPOULOS, LOUISIANA CIVIL LAW TREATISE, PROPERTY §§ 11:20, 11:39, 11:41 (5th ed. 2015) (hereinafter PROPERTY).

[23] Even if the Pedro Well ultimately drained gas from the Marys' land, Article 14 of the Mineral Code would bar the Marys from recovering the value of this gas. *See* LA. REV. STAT. § 31:14 ("A landowner has no right against another who causes drainage of liquid or gaseous minerals from beneath his property if the drainage *results from drilling or mining operations on other lands*." (emphasis added)).

[24] If, hypothetically, QEP rented the Pedro Pipelines to a third party, then the rent would clearly be a civil fruit of the pipelines, and the Marys might be entitled to some portion of that rent. *See* LA. CIV. CODE art. 551 ("Civil fruits are revenues derived from a thing . . . by reason of a juridical act, such as rentals . . . ."). But it seems a bridge too far to say that gas extracted from neighboring land and transported through the Pedro Pipeline is a "fruit" of that pipeline.

[25] 110 So. 630 (La. 1926).

[26] *Id.* at 632.

unlawfully, and against the will of the owner of the land, exercises thereon rights belonging exclusively to the owner, must account to such owner for all the *fruits* of his unlawful exercise of that right."[27] Furthermore, the "fruits" in that instance were the "profits [the defendants] derived from the unlawful exercise of a right which belonged exclusively to plaintiff;" i.e., "the ill-gotten gains of their unlawful act, done to the manifest prejudice of plaintiff's right."[28] Thus, while the wild animals were not themselves fruits of the land,[29] the profits the defendants earned from selling the animal furs were fruits that could be disgorged if the defendants were in bad faith.[30]

In the second case, *Corbello v. Iowa Production*, the plaintiffs leased part of their land to Shell Oil Company so it could construct and operate an oil terminal.[31] Oil from various sources and of different weight and grade were transported to the terminal where they were mixed together in order to obtain a higher price.[32] Shell continued to operate the terminal after the lease expired, and the plaintiffs eventually sued to evict Shell and recover damages.[33] Citing *Rosenthal*, the court held that Shell had to disgorge the profits it earned from the operations at the oil terminal during the time it was

---

[27] *Id.* (emphasis added) (citing, inter alia, LA. CIV. CODE art. 501 (1870) (current version at LA. CIV. CODE art. 485)).

[28] *Id.* at 633.

[29] *See id.* at 632 ("It is quite true that one does not own the wild animals which stray into his field, and, accordingly, he cannot claim such animals from another merely because they may have been killed or captured on his land." (citing LA. CIV. CODE art. 3415 (1870) (recodified at LA. CIV. CODE art. 3413)).

[30] *Id.* at 633 (citing La. Civ. Code art. 501 (1870) (recodified at LA. CIV. CODE 487)); *see also* PROPERTY § 2:28 n.1, *supra* ("Trapping royalties are fruits.").

[31] 850 So.2d 686, 691 (La. 2003)*, superseded in part by statute*, LA. REV. STAT. § 30:2015.1.

[32] *Corbello v. Iowa Prod.*, 806 So. 2d 32, 42 (La. App. 3 Cir. 2001).

[33] *Corbello*, 850 So. 2d at 691, 708-09.

a bad faith possessor.[34]

We assume without deciding that *Rosenthal* and *Corbello* would allow recovery of profits from gas produced from neighboring property and transported via pipeline over the Marys' land under Louisiana property, contract, or tort law. We nevertheless conclude that the Marys cannot recover under the facts of this case. Disgorgement in this circumstance is limited to the *additional* profits QEP earned, if any, as a direct result of installing the Pedro Pipelines partly outside the servitude boundary, as compared to the profits QEP would have earned if it had installed the pipelines entirely within the servitude. In *Rosenthal* and *Corbello*, the court awarded the plaintiffs all of the profits the defendants earned from their activity on the plaintiffs' land while in bad faith, because all of that activity was prohibited. Here, however, most of QEP's activity on the Marys' land is authorized—the two Pedro Pipelines deviated from the servitude for a total of approximately 46 feet, while approximately 8,000 feet of pipelines used to carry this gas and saltwater over the Marys' land were within the servitudes.[35] It does not follow, then, that QEP must disgorge *all* of its profits from this gas, because not all of QEP's activity was unauthorized. It is only the additional profits QEP earned as a result of its encroachment that could be properly considered "the ill-gotten gains of [the defendant's] unlawful act, done to the manifest prejudice of plaintiff's right."[36] We note that this interpretation appears to align with the view expressed in a recent update to the Louisiana Civil Law Treatise, which commented on the district

---

[34] *Id.* at 709.

[35] The two Pedro Pipelines connected to the two Mary Pipelines, each of which then runs for roughly 4,000 feet before exiting the Marys' property. ROA.647. QEP owned the Mary Pipelines, and those pipelines are within their respective servitude.

[36] *Rosenthal*, 110 So. at 633.

No. 21-30195

court's decision in this case.[37]

The Marys admitted at oral argument that they have no evidence that QEP earned any additional profit on account of the minor deviation of the Pedro Pipelines beyond the servitude boundary.[38] Therefore, the Marys are not entitled to disgorgement under an accession theory.

### B.　　Breach of Contract

When a servitude is created by a contract, the use and extent of the servitude is regulated by the contract.[39] When QEP placed the Pedro Pipelines partially outside the servitude boundary, it became liable under a breach of contract theory.[40] However, disgorgement is not a remedy for

---

[37] *See* 2 A.N. Yiannopoulos & Ronald J. Scalise Jr., Louisiana Civil Law Treatise, Property § 2:31 n.18 (5th ed. Supp. 2021) ("'[The Marys'] claim was for disgorgement of profits made by [QEP] for an alleged bad faith intrusion onto the [the Marys'] land by transmission pipelines. As such, proper analysis should involve consideration of what profits were made by [QEP] from unauthorized use of the [the Marys'] land, *if any*, not a consideration of what was transported via the pipeline. *It is notable, however, that the [district] court, as a factual matter, does note that the [Marys] 'have failed to show any additional profit [QEP] realized as a result of the misplacement of these pipelines.'*" (emphasis added)).

[38] The Marys do assert that QEP saved some construction costs by building the Pedro Pipelines partially outside the servitude. However, the district court excluded the only evidence supporting this assertion, and we have already concluded that the Marys waived any argument that this decision was improper. *Supra* note 12. Accordingly, we do not consider whether saved construction cost is a "fruit" that can be disgorged.

[39] La. Civ. Code art. 697; *Terrebonne Par. Sch. Bd.*, 290 F.3d at 311; 4 A.N. Yiannopoulos, Louisiana Civil Law Treatise, Predial Servitudes §§ 7:5, 7:6 (4th ed. 2013) (hereinafter Predial Servitudes).

[40] *See* Predial Servitudes § 7:9, *supra* ("When the owner of the dominant estate makes a use of the servitude that exceeds the limits established by title or by prescription, he may be liable to the owner of the servient estate under the laws of property as well as under the laws of obligations for aggravation of the servient estate. Furthermore, if the owner of the dominant estate purports to exercise, without right, a different servitude, he may be liable to the owner of the servient estate for trespass like any other person." (footnotes omitted)); *see also Huggs, Inc. v. LPC Energy, Inc.*, 889 F.2d 649, 655 (5th Cir.

No. 21-30195

breach of contract under Louisiana law.

Civil Code Article 1995 states that damages for breach of contract "are measured by the loss sustained by the *obligee* [i.e., the Marys] and the profit of which *he* has been deprived."[41] The Marys do not explain how the minor deviation of the pipelines outside the servitude deprived them of any profits, much less the profits from the sale of all the gas that flowed through those pipelines. Articles 1996 and 1997 do allow different damages depending on whether an obligor breaches a contract in good or bad faith.[42] However, neither article requires an obligor to disgorge its profits.[43]

The Marys cite no Louisiana authorities to support their argument that disgorgement is available for breach of contract. Accordingly, we conclude that the Marys are not entitled to disgorgement under a breach of

1989) ("Louisiana courts recognize that the same acts or omissions may constitute breaches of both general duties and contractual duties, giving rise to actions in both tort and contract. . . . Generally, where a person neglects to do what he is obligated under a contract, he has committed a passive breach of the contract. If he negligently performs a contractual obligation, he has committed active negligence and thus an active breach of the contract. A passive breach of contract warrants only an action for breach of contract; an active breach of contract, on the other hand, will also support an action in tort under La. Civ. Code art. 2315." (citations omitted)).

[41] La. Civ. Code art. 1995 (emphasis added). The Marys are the obligees, because they are the ones owed performance by QEP, the obligor. *See id.* art. 1756.

[42] We note that "good faith" and "bad faith" carry different meanings in the breach of contract context than in the accession context. *See id.* art. 1997 revision cmt. (b) ("An obligor is in bad faith if he intentionally and maliciously fails to perform his obligation). QEP argues that there is no evidence that its conduct rose to this level. We do not address this issue, because we find disgorgement is never available under Louisiana law for breach of contract.

[43] In the case of good faith breach, the obligor is liable to the obligee "only for the damages that were foreseeable at the time the contract was made." *Id.* art. 1996. When the obligor commits a bad faith breach, the obligor becomes liable for "all the damages, foreseeable or not, that are a direct consequence of his failure to perform." *Id.* art. 1997.

contract theory.

### C.    Trespass

Trespass is the unlawful physical invasion of the property or possession of another.[44] When QEP placed the Pedro Pipelines partially outside the servitude boundary, it trespassed onto the Marys' property.[45]

The Marys again rely on *Corbello*, discussed above, to assert that they are entitled to disgorgement under a trespass theory. In *Corbello*, the court stated that the defendant's continued possession of the oil terminal after the lease expired "constituted trespass."[46] The court then applied, via reference to *Rosenthal*, the rules from property law regarding accession and fruits to determine whether the defendant was required to disgorge its profits.[47] QEP, however, cites *Roman Catholic Archdiocese of New Orleans v. Louisiana Gas Service Co.*[48] for the proposition that disgorgement is not available because tort damages are meant to place the injured party in as good a position as before his property was damaged, but not a superior position. QEP also argues that "bad faith" under accession is different from "bad faith" in the tort context—requiring intentional and malicious conduct—and there is no evidence that QEP's conduct rose to this level.

We need not decide these issues because, even if the Marys are correct that *Corbello* would permit disgorgement under a trespass theory, the same

---

[44] *Boudreaux v. Plaquemines Par. Gov't*, 22 So. 3d 1117, 1118 (La. App. 4 Cir. 2009); *Phillips v. Town of Many*, 538 So. 2d 745, 746 (La. App. 3 Cir. 1989).

[45] *See* Predial Servitudes § 7:9, *supra*; *Huggs, Inc.*, 889 F.2d at 655.

[46] 850 So. 2d at 709.

[47] *Id.*; *see also Aertker v. Placid Holding Co.*, No. 07-473, 2012 WL 4472002, at *6 (M.D. La. Sept. 27, 2012).

[48] 618 So. 2d 874, 876 (La. 1993).

analysis we applied above[49] interpreting *Corbello* under an accession theory would control here. Specifically, the most the Marys could possibly recover would be the additional profits QEP earned as a direct result of its encroachment, and the Marys have no evidence of such additional profits.

## IV.    CONCLUSION

Louisiana law provided the Marys with several remedies after QEP installed the Pedro Pipelines partially outside the servitude boundary. For example, Article 497 gave them the option to either keep the encroaching segments of the pipelines, subject to reimbursing QEP, or demand their removal, plus any damages the Marys may have sustained.[50] However, in no event did the encroachment render QEP liable to the Marys for all of the profits it earned from the gas that travelled through the pipelines. The most QEP would have to disgorge are the additional profits it earned as a direct result of the encroachment as compared to the profits it would have earned if the pipelines had been installed entirely within the servitude boundary. Because the Marys have no evidence that QEP earned any such additional profits, the district court correctly determined that QEP was not responsible for disgorging its profits. Accordingly, the judgment of the district court is AFFIRMED.

---

[49] *Supra* Part III.A.

[50] La. Civ. Code art. 497; *see also* Predial Servitudes § 7:10, *supra*.